**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| JAMES HULCE, et al.,<br><br>Plaintiff,<br><br>v.<br><br>ZIPONGO, INC. d/b/a FOODSMART,<br><br>Defendant. | Case No. 2:23-cv-00159-LA |

**ZIPONGO, INC D/BA/ FOODSMART'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 3

A. Foodsmart only offers free services to CCHP members, and its callers cannot accept payment directly from any non-CCHP members .......... 3

B. Plaintiff sues over phone calls offering free services through his healthcare plan .......... 7

III. LEGAL STANDARD .......... 8

IV. ARGUMENT .......... 9

A. Foodsmart is entitled to summary judgment because none of the calls at issue are telephone solicitations within the meaning of the TCPA's DNC rules. .......... 9

B. Plaintiff's urged interpretation of the DNC rules would violate the First Amendment. .......... 12

C. Foodsmart isn't vicariously liable for the calls at issue in this suit because it had no knowledge of Plaintiff's alleged do-not-call request. .......... 15

D. Plaintiff's internal DNC claim fails because Foodsmart and QCS implemented compliant internal DNC procedures. .......... 18

V. CONCLUSION .......... 19

## I. INTRODUCTION

In this putative class action lawsuit, Plaintiff James Hulce alleges that Defendant Zipongo Inc. d/b/a Foodsmart violated the Telephone Consumer Protection Act ("TCPA")'s Do-Not-Call ("DNC") rules in two ways when it contacted him to offer him free nutritional counseling services through his healthcare plan. First, by calling him on a number listed on the National DNC Registry. And second, by calling him after he requested to be placed on Foodsmart's internal DNC list. But the TCPA's DNC rules apply only to "telephone solicitations," defined as communications that *encourage* consumers to *purchase* goods or services for sale. Only one material question thus governs Plaintiff's claims: whether the phone calls encouraged Plaintiff to purchase anything. The answer to that question is no, so the Court should grant Foodsmart summary judgment.

The communications Plaintiff received were not solicitations because it is clear on their face that they didn't encourage him to purchase anything, or otherwise offer any good/services for sale. Instead, the purpose of the communications was to inform Plaintiff about completely ***free*** nutritional services that were available through his CCHP healthcare plan, which is also free to him as part of his state-funded Medicaid insurance. That purpose is consistent with Foodsmart's relevant business for CCHP too: offering low-income and disabled individuals ***free*** nutritional counseling services to prevent future health issues and thus reduce the overall burden on the taxpayers that support Medicaid.

As such, none of the communications sent by Foodsmart (the "Foodsmart CCHP communications"), whether the texts sent by Foodsmart or the calls by Foodsmart's vendor, Quality Contact Services ("QCS"), were designed to or did encourage Plaintiff to buy anything. In fact, neither QCS nor Foodsmart could have accepted payment from any CCHP member in

response to those calls, nor was QCS able to accept any payment, from anyone. Plaintiff's claims thus fails because the communications at issue weren't solicitations subject to the TCPA.

To permit Plaintiff's claims on these facts would not only contradict the letter and spirit of the TCPA but hurt low-income individuals and the tax-paying public who sponsor these programs. Congress didn't intend the TCPA's national and internal DNC's provisions to apply that broadly, preventing low-income consumers from receiving informational communications about free state-funded healthcare programs that were created for their benefit. In fact, such an interpretation would violate the First Amendment given that the TCPA's telephone solicitation ban would then regulate non-commercial speech in a content-based manner that couldn't survive strict scrutiny. So the doctrine of constitutional avoidance further compels the conclusion that the communications at issue here were not telephone solicitations.

And even if QCS's phone calls were "telephone solicitations" that violated the TCPA (they were not), Foodsmart couldn't be liable for them. QCS's call records show that Plaintiff answered the first phone call QCS ever made to Plaintiff, and Plaintiff claims he requested not to be contacted further. Assuming Plaintiff's testimony is true, Foodsmart cannot be directly or vicariously liable for calls after that date. It cannot be directly liable because Foodsmart did not make the calls; QCS did. And it cannot be vicariously liable for QCS's conduct because Foodsmart did not permit QCS to call people who had requested not to be called. Foodsmart is entitled to summary judgment on this additional basis as well.

Finally, Plaintiff's internal DNC claim fails because both Foodsmart and QCS have and honor internal DNC policies for telephone solicitations because they do not want to annoy people, even though they are not required by law to have them for the calls at issue because they are not telephone solicitations. To the extent Plaintiff received calls from QCS after he told him to stop

calling, that was the result of one-off human error. As such, the safe harbor of the internal DNC rules precludes liability here on Plaintiff's internal DNC claim.

For these reasons and others discussed herein, Foodsmart respectfully requests that the Court enter summary judgment in its favor.

## II. FACTUAL BACKGROUND

### A. Foodsmart only offers free services to CCHP members, and its callers cannot accept payment directly from any non-CCHP members.

Foodsmart is a mission driven company that provides nutritional telehealth consultations to help individuals improve their overall health and to combat food insecurity, a serious problem for over 17,000,000 Americans who are unable to acquire enough food.[1] Declaration of Jared Scharen at ¶ 4 (attached hereto as Exhibit A). To achieve this mission, Foodsmart works with healthcare plans and providers across the country to facilitate these telehealth nutritional visits. *Id.* at ¶ 5. During these visits, Foodsmart integrates dietary assessments and nutrition counseling from dietitians with cost-effective meal planning for the whole family. *Id.* at ¶ 6. In addition, Foodsmart devotes substantial resources to help eligible insurance plan members battle food insecurity by helping them enroll in government assistance programs, such as SNAP, for low-income individuals. *Id.* at ¶ 7. Research studies on Foodsmart's programs show that its preventative services not only benefit members by improving their nutritional choices (and their overall health) but also decrease overall healthcare costs for healthcare providers and the state. *Id.* at ¶¶ 8-10; 2022 Optum Claims Study at 2 (attached as Exhibit 1 to Scharen Decl.) ("Foodsmart saved the health plan, on average, $40 PMPM [per member per month] after adjusting for high value claims

---

[1] Per statistics from the United States Department of Agriculture for 2022. "Key Statistics & Graphics" USDA, available at https://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-u-s/key-statistics-graphics/#foodsecure (last accessed November 7, 2023) ("12.8 percent (17.0 million) of U.S. households were food insecure at some time during 2022").

and other wellness programs, compared to a matched control group."); Foodsmart CCHP Study at 1 (attached as Exhibit 2 to Scharen Decl.) ("the average 12 month PMPM claims savings generated by Foodsmart across major chronic conditions compared to controls: savings ranged from $62 to $871 PMPM in some members.").

As relevant to this suit, CCHP, a Wisconsin based healthcare provider, contracted with Foodsmart to provide nutritional services to its plan members. Ex. A at ¶ 11. CCHP specifically chose to contract with Foodsmart to better serve its large number of plan members who receive services through Badgercare Plus, a state-run and state-funded Medicaid plan. *Id.* at ¶ 12. To qualify for this Medicaid program, members must either be low income or have a qualifying disability, making easily accessible telehealth nutritional plans a top priority to help address those members' overall health and struggles with food insecurity. *Id.* at ¶ 14. Because Badgercare Plus is a state funded healthcare program, members pay no cost for the services they receive through CCHP by means of a monthly premium, copay, or otherwise. *Id.* at ¶ 13; Deposition of James C. Hulce at 37 (attached hereto as Exhibit B).

To facilitate the provision of these completely free services, Foodsmart sends informational text messages and phone calls to CCHP members. *Id.* at ¶ 15. It does so at the request of CCHP, and after those communications are approved by the state of Wisconsin, which also has an interest in people participating in Foodsmart's free program. *Id.* at ¶ 16. In addition to informing members about these benefits that are fully covered through their plan, Foodsmart also conducts gift card giveaways and raffles to help these low-income members buy healthy groceries. *Id.* at ¶ 17. The text messages at issue here, which are sent directly by Foodsmart, expressly provide that Foodsmart's services are free and offer to help CCHP members set up appointments to assess and improve their nutritional health. *Id.* at ¶ 18. For example, the sole text message sent to Plaintiff

(shown below) provides that CCHP members can receive free $25 gift cards for completing a "no cost" visit and taking the Foodsmart Nutriquiz, a dietary tool designed to health members develop healthy eating habits:

> October is the month of sweet treats & pumpkin spice everything. Make meeting with a personal dietitian part of your Fall routine & balance your blood sugar
>
> Bundle Up! Get a $25 gift card when you complete a no cost visit in Oct., and $25 for taking the **Foodsmart** Nutriquiz!
> https://fdsmt.co/3NdUw1V
> Reply stop to unsubscribe.
>
> (414) 246-0371 • Oct 27, 2022

*Id.* at ¶ 19. Recipients of these messages who no longer wished to receive these messages could easily opt out by responding "stop," as described in the message above (and even though this was not legally required, since these messages don't qualify as "telephone solicitations" as explained below). *Id.*

Foodsmart also calls CCHP members through its vendor, QCS. *Id.* at ¶ 20; Declaration of Richard Hamilton at ¶ 4 (attached hereto as Exhibit C). At the start of every outbound call, QCS informs members that the services are being offered to them for free through their healthcare provider:

Hello. May I please speak to [Firstname]?

Hi [Firstname], this is [AGENT]. I'm calling on behalf of your health plan, Chorus Community Health Plans to let you know about a 12 Days of Giving promotion they are conducting with Foodsmart. Just by being a member of Chorus, you can win one of 120 $100 gift cards that are being gifted. Have you heard about this new giveaway?

**If no**

Let me tell you more about it! Chorus Community Health Plans and Foodsmart have partnered to provide telehealth visits with a nutrition coach at no cost to members. During the holiday season, Chorus members who meet with a nutrition coach, which is paid for by Chorus, will be entered to win a $100 gift card of their choice. Every day from December 12th through December 23rd we'll draw 10 winners! That's a total of 120 prizes! This is on top of the guaranteed $25 grocery gift card you can receive for completing your first free video or audio appointment. As you can imagine, appointments are filling up fast, so let's get you scheduled today! What days of the week typically work best for you?

**If yes**

Great! So as you know, Chorus Community Health Plans and Foodsmart have partnered to provide telehealth visits with a dietitian at no cost to members. Chorus members who meet with a nutrition coach, which is paid for by Chorus, will be entered to win a $100 gift card of their choice. Every day from December 12th through December 23rd we'll draw 10 winners! That's a total of 120 prizes! This is on top of the guaranteed $25 grocery gift card you can receive for completing your first free video or audio appointment. As you can imagine, appointments are filling up fast, so let's get you scheduled today! What days of the week typically work best for you?

*Id.* at ¶ 5. Because QCS only calls CCHP members to inform them of free services provided to them through their state-funded plans, it lacks the ability to even take or process payments if it accidentally reaches an ineligible individual. *Id.* at ¶ 8. As such, if an individual who wasn't a CCHP member received an outbound call from QCS by mistake (which could occur for numerous reasons, including because the eligibility file had not yet been updated after a member changed insurance plans), upon learning that they weren't a CCHP member, and thus ineligible for the program, the QCS representative would terminate the call. *Id.* at ¶ 6.

Additionally, even though not legally required to do so because its calls are not telephone solicitations, Foodsmart requires QCS to honor all DNC requests, meaning if someone says "do not contact me again" or something similar, QCS is not permitted to make any further calls and must notify Foodsmart immediately so Foodsmart knows not to text the consumer. *Id* at ¶ 7; Ex.

A. at ¶¶ 21-23. Both entities (Foodsmart and QCS) have written policies requiring the immediate honoring of such DNC requests, train their employees on them, and honor such requests indefinitely. Ex. A at ¶¶ 27-31; Ex. C at ¶¶ 11-15.

### B. Plaintiff sues over phone calls offering free services through his healthcare plan.

Plaintiff applied and was approved for the state-funded Badgercare Plus Medicaid program and began receiving completely free, state-funded healthcare in September 2021. Ex. B at 36-37. Thereafter, Plaintiff received a single text message directly from Foodsmart in October 2022. *Id.* at 59. Plaintiff responded "stop" to "unsubscribe" from further texts, as the text he received instructed he could do. Ex. A at ¶ 24. He was promptly removed from the text-message list and wasn't texted again (even though, again, that wasn't legally required because these were not "telephone solicitations" to which the TCPA's internal DNC rules apply). *Id.*

Plaintiff was first called by QCS in December 2021, and then again in February 2022. Ex. C at ¶ 9; Ex. 1 to Ex. C. Although Plaintiff testified that during those calls he asked not to be contacted further about Foodsmart's services, the call record disposition notes only show that Plaintiff wasn't interested in Foodsmart's free services at that time. Hulce Deposition at 73-74; Ex. C at ¶ 9. QCS never notified Foodsmart that Plaintiff wasn't interested in Foodsmart's services. Ex. A at ¶ 23. Plaintiff received four additional phone calls from QCS in the late spring of 2022, all of which went unanswered Ex. C at ¶ 9; Ex. 1 to Ex. C. In November 2022, Plaintiff sent CCHP (not QCS or Foodsmart) a "grievance letter" asking not to be contacted about Foodsmart's service. Ex. B at 75. The letter was never transmitted to Foodsmart or QCS, and so Plaintiff's number was not placed on QCS's or Foodsmart's internal DNC list. Ex. A at ¶ 26; Ex. C at ¶ 10.

In any event, for reasons unrelated to this lawsuit, Plaintiff terminated his CCHP insurance effective November 30, 2022. Ex. B at 38-39. Plaintiff thereafter received three additional phone calls from QCS about thirty days after his termination of his CCHP plan: on January 3, 4, and 5, each of which went directly to voicemail. *Id.* at 70-71. Plaintiff received these communications because the eligibility list (showing he was no longer a CCHP member) hadn't yet been updated in the short time window following the cancellation of his insurance. Ex. A at ¶ 25.

Plaintiff then filed this lawsuit. Ex. B at 70-71; *See generally* Complaint. Plaintiff alleges Foodsmart violated the TCPA by sending telephone solicitations to him although his number is allegedly listed on the National DNC Registry and though he allegedly requested to be placed on QCS's internal DNC list. Complaint at ¶¶ 65-66. Plaintiff asks the Court to certify two nationwide TCPA classes: (a) one comprised of consumers who received telephone solicitation calls while their numbers were registered on the national DNC registry; and (b) one comprised of consumers who were contacted after they'd requested not to be contacted about Foodsmart's free services. *Id.* at ¶ 51. Plaintiff seeks millions of dollars in damages from Foodsmart, a small company that provides nutritional healthcare to low-income and food insecure individuals.

For the reasons set forth below, Plaintiff's claims are meritless under the plain language of the statute, and Foodsmart is entitled to summary judgment.

## III. LEGAL STANDARD

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the nonmoving party, demonstrates there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the lawsuit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the party moving for summary judgment offers proof of the absence of any genuine issue of material fact, the party opposing the motion is required to go beyond the pleadings and establish "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Golden v. McCaughtry*, 937 F. Supp. 818, 821 (E.D. Wis. 1996). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence such "that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc*., 477 U.S. at 252 (1986). Self-serving assertions and affidavits without factual support will not defeat a motion for summary judgment. *See Schimpf v. Gerald, Inc.*, 52 F. Supp. 2d 976, 993 (E.D. Wis. 1999); *Jones v. Merchants Nat'l. Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994).

## IV. ARGUMENT

### A. Foodsmart is entitled to summary judgment because none of the calls at issue are telephone solicitations within the meaning of the TCPA's DNC rules.

The Court should grant summary judgment to Foodsmart because the calls Plaintiff received are not telephone solicitations subject to the TCPA's national or internal DNC rules. They didn't encourage him to purchase anything and instead only referenced and concerned free nutritional services for CCHP members, who also paid nothing for their state funded insurance.

For background, the TCPA and its regulations provide that "[n]o person or entity shall initiate any **telephone solicitation** to: . . . [a] residential telephone subscriber who has registered his or her telephone number on the [DNC list] of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2) (emphasis added). A "**telephone solicitation**" is defined as "a telephone call or message [initiated] for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services . . . ." 47 U.S.C. § 227(a)(4) (emphasis added). The TCPA's prohibition on "telephone solicitations"

only to numbers registered on an internal or national DNC list—as opposed to all types of telephone calls—was carefully considered and crafted by Congress, which specifically recognized that the "most unwanted telephone solicitations are commercial in nature." H.R. Rep. No. 102–317, at 16 (1991). "The TCPA therefore authorized the FCC to establish a national database of consumers who object to receiving 'telephone solicitations,' which the act defined as commercial ***sales*** calls." *Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1235 (10th Cir. 2004) (citing Pub. L. No. 102–243, 105 Stat. 2394, at § 3 (1991) (emphasis added)); *Spiegel v. Reynolds*, 2017 WL 4535951, at *4 (N.D. Ill. Oct. 11, 2017) (dismissing DNC claim on summary judgment, explaining TCPA's DNC rules only apply to telephone solicitations).

The fact that only commercial solicitation calls or texts offering "property, goods, or services" for "sale" to telephone numbers registered on an internal or national DNC list are prohibited is further underscored by the fact the TCPA prohibits "any" calls in some instances, and only "telephone solicitations" in others. *Compare* 47 C.F.R. § 64.1200(c)(2) (prohibiting only "telephone solicitations" to numbers registered on the NDNC), *with* 47 U.S.C. § 227(b)(1)(A)(iii) (generally prohibiting the placement of "any call" to a cell phone using an "automatic telephone dialing system" or prerecorded message, where there is no prior express consent), and 47 U.S.C. § 227(b)(1)(B) (generally prohibiting "any telephone call to a residential telephone line" using a prerecorded message, where there is no prior express consent). In short, Congress intentionally defined "telephone solicitation" within the TCPA to be restricted to commercial calls or texts that *solicit* the *purchase* or rental of property, goods, or services.

None of the calls to Plaintiff constituted a "telephone solicitation" that might sustain a TCPA internal or national DNC claim because all Foodsmart CCHP calls expressly stated they concerned (and did in fact concern) entirely ***free*** services. So the purpose of the calls wasn't to

encourage the *purchase* of anything, let alone goods and services—a fact several courts have found dispositive in similar DNC cases. For example, in *Trujillo v. Free Energy Sav. Co., LLC*, the court granted the defendant summary judgment on the plaintiff's DNC claim, concluding that the communications at issue in that suit, which offered free services to low-income individuals, weren't solicitations because they did "not evince any intent to secure a purchase by [the individual]; instead, they invite[d] the recipient to schedule free services." 2020 WL 7768722, at *2-3 (C.D. Cal. Dec. 21, 2020). Accordingly, the court concluded, based on the statutory text, that the messages at issue didn't violate the TCPA, notwithstanding that Plaintiff's number was on the national DNC registry. *Id.* at 3. *See also Spiegel*, 2017 WL 4535951, at *4; (dismissing DNC claim on summary judgment because the calls did not encourage plaintiff to purchase anything); *Morris v. Unitedhealthcare Ins. Co*., 2016 WL 7115973, at *8-9 (E.D. Tex. 2016) (rejecting argument that calls from an insurer regarding free benefits, which might encourage commercially advantageous behavior such as client retention, violated the TCPA because they were not "telephone solicitations"); *Friedman v. Torchmark Corp*., 2013 WL 4102201, at *6 (S.D. Cal. Aug. 13, 2013) (call promoting a "free webinar" was not a telephone solicitation because it did not attempt to sell anything to the plaintiff).

Setting aside the fact that the QCS phone calls on which Plaintiff bases his lawsuit do not solicit consumers to purchase anything on their face, Foodsmart's vendor, QCS, lacks the capacity to ***even accept payment*** from consumers they call or to otherwise sign them up for Foodsmart's services except through the free CCHP program. Ex. C at ¶ 8 ("QCS does not have the ability to even collect payment directly from consumers."). That's because *no one* can pay for the services that were the subject of the Foodsmart CCHP calls, even indirectly, through a monthly premium or copay because the program was offered as a free benefit to low-income and disabled individuals

through the state's Medicaid program. Ex. A at ¶ 13. So even if Plaintiff had picked up any of QCS's few calls after he discontinued his CCHP plan and wanted Foodsmart's services, QCS could not have sold him anything. Ex. C at ¶ 8. It would have simply told him he wasn't eligible for the services they were calling about and ended the call, as explained above. *Id.* at ¶¶ 6, 8. This requires summary judgment for Foodsmart, under the plain text of the TCPA and all the cases cited above.

In addition to contradicting the text of the TCPA, any other ruling would perversely hurt the consumers the DNC registry is intended to protect. Indeed, since tens of millions of numbers are registered on the national DNC registry, such a ruling would prevent a large portion of the 17+ million food insecure consumers in the U.S. from learning about potentially life-saving free programs just because those individuals (or someone who used to have their number many years ago) registered their number on the DNC registry because they didn't want to receive auto warranty sales calls. The result would be fewer low-income CCHP members learning of the opportunity to receive free nutritional assistance through their state funded insurance plans and higher healthcare costs for taxpayers. Congress passed the TCPA to curb sales solicitations; not those that notify consumers of a free public benefit. *See* H.R. Rep. No. 102–317, at 16 (1991) (the "most unwanted telephone solicitations are commercial in nature") (emphasis added).

For the uncontroverted reason that none of Foodsmart's calls were "telephone solicitations" under the TCPA, Plaintiff's DNC claim fails as a matter of law.

### B. Plaintiff's urged interpretation of the DNC rules would violate the First Amendment.

Finally, to the extent the TCPA's DNC rules sweep in the healthcare speech at issue in this case, they would violate the First Amendment. The Court should adopt the plain language of the DNC rules to avoid grappling with this constitutional question.

In explaining the distinction between commercial and noncommercial speech, the Supreme Court has explained that commercial speech is "speech which does no more than propose a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer*, 425 U.S. 748, 762 (1976) (quotation marks omitted); *accord United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). Here, it is undisputed that the communications at issue did not "propose a commercial transaction," and they certainly did not "do[] no more than propose a commercial transaction." Instead, they provided information about an *entirely free* program that helped recipients and the taxpayers who fund Medicaid by battling food insecurity, bettering treatment outcomes, and reducing cost in the healthcare system. Ex. A at ¶¶ 8-10; Exs. 1 & 2 to Ex. A.

Regulations that restrict non-commercial speech in a content-based manner are subject to strict scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 522, 580 (2011). And it is undisputed that the DNC rules, under Plaintiff's interpretation, would regulate non-commercial speech based on their content. A call or text that says "I am running for office and want your vote," "Join us for worship Sundays at 10 a.m.," or "Come to our charity event and donate clothing" would be lawful. But one that says "sign up today to receive a free nutritional visit through your healthcare plan" would be illegal. As the Supreme Court recently said in recently striking down another section of the TCPA, "[t]hat is about as content-based as it gets." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2346 (2020) (pl. op.).

As such, Plaintiff's interpretation of the DNC rules would need to survive strict scrutiny, which they could not do. In order to pass that test, a law must be the "least restrictive means" of advancing a "compelling" governmental interest. *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989). This test is so difficult to meet that the Supreme Court has labeled "content-based" laws "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U. S. 155, 163 (2015). So

it's unsurprising that an interpretation of the DNC rules that sweeps in the healthcare speech at issue here would not pass either prong of the strict scrutiny test.

As to the first prong, the Supreme Court has described compelling interests as "'interests of the highest order'" and "'vital state interests.'" *Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1131 (5th Cir. 2022) (quoting *Williams-Yulee*, 575 U.S. at 447; *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021)). They include such interests as "combating terrorism, protecting election integrity, [and] remedying the effects of past unconstitutional race discrimination." *Willey*, 27 F.4th at 1131. Preventing a limited subset of at-risk Americans from being annoyed by calls about free healthcare services could thus never qualify as a "compelling" interest. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788, 3793 (2005) (FCC recognizing that purpose of DNC rules is curbing "fraudulent and abusive solicitations" and protective "privacy in the home", which the FCC itself labels as "substantial" interests, not compelling). Plaintiff's read of the DNC rules would be unconstitutional for this reason alone.

Nor could Plaintiff ever show that the DNC rules, as he interprets them, are the "least restrictive means" of reducing annoying calls. That is because the DNC rules unquestionably do not apply to all types of calls that people find *far more annoying* than those about free services available to them under their health plan. That includes debt collection calls, political solicitations, charitable donation calls for organizations that recipients may vehemently disagree with, and so on. After all, "[a] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (quoting *The Florida Star*, 491 U.S. at 541–542 (Scalia, J., concurring in part)). Plaintiff's interpretation of the DNC rules would therefore be unconstitutional for this additional reason.

The Court should avoid those constitutional problems by adopting the "narrow[er] reading" of the TCPA's definition of telephone solicitations that does not sweep in the communications at issue. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002). Indeed, courts regularly adopt the textually plausible statutory interpretation that avoids constitutional concerns. *Edward J. DeBartolo Corp. v Florida Gul Coast Bldg. & Const. Trades Council*, 485 U.S. 568 (1988) (applying constitutional avoidance in First Amendment context). Interpreting the TCPA's definition of "telephone solicitation" to exclude the informational notices Foodsmart sent to low-income healthcare members is not just "plausible," but the only possible interpretation under the plain language of the statute, the great weight of authority, and all the evidence, as explained above. But were the Court to hold otherwise, the TCPA's ban on commercial telephone solicitations would not pass First Amendment scrutiny.[2]

**C. Foodsmart isn't vicariously liable for the calls at issue in this suit because it had no knowledge of Plaintiff's alleged do-not-call request.**

Even assuming the telephone calls at issue are telephone solicitations (they aren't), Foodsmart cannot be directly or vicariously liable for them.

The TCPA imposes civil liability only on the party who "makes" or "initiates" a call, and the FCC has clarified that a "person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call." *In re Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6582-83 (2013). Here, it is undisputed that Foodsmart didn't place the phone calls at issue in this

[2] Because the Court should grant summary judgment in Foodsmart's favor without reaching the "question of the constitutionality" of the TCPA's ban on commercial telephone solicitations in light of the doctrine of constitutional avoidance, Foodsmart believes it is unnecessary to file a Rule 5.1 notice. Fed. R. Civ. Proc. 5.1(a). To the extent the Court believes otherwise, Foodsmart will file and serve such a notice.

case; QCS did. Ex. A at ¶ 20; Ex. C at ¶ 4. Accordingly, Foodsmart is not directly liable for the phone calls in this case.

So the only way Foodsmart could be liable for QCS's calls is if plaintiff established one of three theories of agency: actual agency, apparent authority, or ratification. *In re Dish Network*, 28 F.C.C. Rcd. at 6584. Actual authority exists when a principal expressly authorizes an agent and the agent acts on the principal's behalf and subject to the principal's control. *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011) (quotation omitted). An agent does not have actual authority to act contrary to the known wishes and instructions of its principal. *Select Creations, Inc. v. Paliafito America, Inc.*, 830 F. Supp. 1223, 1234 (E.D. Wisc. 1993) (*citing Old Security Life Ins. v. Continental Illinois Nat. Bank*, 740 F.2d 1384, 1391 (7th Cir. 1984). Apparent authority exists when a third-party reasonably relies on the principal's manifestation of an agent's authority to the third party. *Am. Soc'y of Mech. Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 565–74, (1982) (referencing the Restatement (Second) of Agency § 8 (1957)); Restatement (Third) of Agency § 2.03 (2006). Statements by an agent are insufficient to create apparent authority. *Id.* To prove ratification, a plaintiff must show that: (1) the act, was performed on behalf of the principal, (2) the principal knew or reasonably should have known the material facts, (3) the principal ratified the entire transaction; and (4) the principal had the requisite legal capacity. *See Select Creations, Inc. v. Paliafito America, Inc.*, 830 F. Supp. 1223 (E.D. Wisc. 1993).

Here, Foodsmart cannot be vicarious liable for any of the calls QCS placed after Plaintiff claims that he told QCS to stop calling (which was on QCS's first call to Plaintiff). That is because QCS acted contrary to Foodsmart's instructions when it did not subsequently place him on its internal DNC list and transmit that request to Foodsmart. Ex. A at ¶ 23. Because calling Plaintiff after that request was contrary to the express instructions Foodsmart gave to QCS, Foodsmart

cannot be liable for that conduct under any theory of actual authority. *See, e.g.*, *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2014 WL 7717584, at *6 (N.D. Il. Nov. 21, 2014), *aff'd*, 816 F.3d 935, 939 (7th Cir. 2016) (entering judgment for defendant in TCPA case on actual authority because, while vendor was permitted to send faxes, the "evidence presented does not establish that [defendant] expressly or impliedly authorized B2B or any B2B representative to send facsimile ads outside of a twenty-mile radius"); *Cordoba v. DIRECTV, LLC*, No. 1:15-CV-3755-MHC, 2021 WL 6841777, at *5 (N.D. Ga. Feb. 12, 2021) (granting summary judgment to defendant in TCPA case and finding no actual authority because telemarketing vendor was not permitted to make cold calls); *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 825 F.3d 793, 798 (7th Cir. 2016) (no actual authority in TCPA case where communications at issue prohibited by alleged principal); *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 450 (9th Cir. 2018) (same); *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 372 (6th Cir. 2015) (same).

Nor can Plaintiff prevail under a theory of apparent authority because the principal (Foodsmart) made no representations about QCS to Plaintiff, as required to prevail under a theory of apparent authority. *Cordoba*, 2021 WL 6841777, at *7 (quoting *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1252 (11th Cir. 2014)). And Plaintiff also cannot show that he "reasonably relied, to his detriment, on any apparent authority with which he alleges [Foodsmart] cloaked [QCS]." *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) (affirming judgment in favor of defendant on TCPA claim). That further forecloses any apparent authority argument as to the telephone calls made by QCS after Plaintiff claims he told it to stop calling.

Finally, Plaintiff cannot establish liability via ratification for those calls because Foodsmart didn't condone the alleged conduct with knowledge of the material facts—i.e., that Plaintiff stated

to QCS that he wasn't interested in Foodsmart's services and that QCS called him anyway. *See Callier v. Wide Merch. Inv., Inc.*, --- F. Supp. 3d ----, 2023 WL 3167440, at *6 (W.D. Tex. Apr. 27, 2023) (no ratification in TCPA case; ratification only exists where a defendant "fail[s] to object to [] or repudiate" an act when it has full "knowledge of all material facts"). Moreover, Foodsmart received no benefit from the calls to Plaintiff, which independently precludes a finding of ratification. *Clark*, 2014 WL 7717584, at *6, *aff'd*, 816 F.3d 935, 939 (7th Cir. 2016) (holding that Plaintiff failed to prove ratification in TCPA case because there was no evidence that defendant benefited from faxes "sent outside of the twenty-mile radius by B2B, nor did he subsequently acquiesce to B2B having sent facsimiles outside of the twenty-mile radius"); *Cordoba*, 2021 WL 6841777, at *7 (no benefit where plaintiff failed to identify a single sale made through the alleged illegal cold calling).

Accordingly, even assuming the calls at issue are telephone solicitations (which they aren't), Foodsmart isn't liable, and it is entitled to summary judgment on those grounds as well.

**D. Plaintiff's internal DNC claim fails because Foodsmart and QCS implemented compliant internal DNC procedures.**

Finally, and although the Court need not reach this issue either because the calls at issue were not "telephone solicitations" within the meaning of the TCPA, Plaintiff's internal DNC claim also fails under the DNC safe harbor provision of the TCPA, which provides that:

> It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection.

47 USC § 227(C)(5)(c). The regulations promulgated under that section provide further detail on the "procedures" a company must "implement" to have a complete defense to an internal DNC claim. 47 C.F.R. § 64.1200(d) (detailing procedures that must be implemented).

Here, both QCS and Foodsmart complied with these regulations to a T, implementing procedures for: (1) maintaining internal, written DNC policies that are available on demand; (2) training employees on the existence and use of the DNC policy; (3) honoring all DNC requests; (4) maintaining records of all requests not to be contacted and honoring those requests for at least 5 years from the time they are made; and (5) identifying on each call, the name of the individual caller making the call, that the call was made on behalf of Foodsmart, and providing the telephone number and address at which the entity could be contacted, if requested. *See* Ex. A at ¶¶ 27-31; Ex. C at ¶¶ 11-15.

Foodsmart and QCS's implementation of these procedures is dispositive of Plaintiff's internal DNC claim, as any call to Plaintiff after a legitimate DNC request was exactly the sort of one-off, manual error that the safe harbor was designed to protect businesses with proper procedures against. *See Simmons v. Charter Communications, Inc.*, 222 F. Supp. 3d 121, 140 (D. Conn. 2016), aff'd 686 Fed. Appx. 48 (2d Cir. 2016) (in affirming summary judgment for defendant, noting that "[t]he mere fact that [plaintiff] received a call after his [] request is not a subsection (d)(3) violation" and "as long as Defendant had a proper procedure in place to implement its DNC policy, no reasonable jury could find for [plaintiff]"); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019) ("Telemarketers can avoid liability for any violation if they can show that the violation was a mistake and that they meet minimum compliance standards"). Foodsmart is entitled to summary judgment on Plaintiff's internal DNC claim for this additional reason.

## V. CONCLUSION

As set forth above, the uncontroverted facts establish that Plaintiff's claims fail. The calls at issue are not subject to the TCPA's national or internal DNC rules because they were purely

informational and did not solicit Plaintiff to purchase anything. And even if they did, Foodsmart isn't liable to Plaintiff under any theory of direct or vicarious liability because QCS placed all the calls at issue and didn't inform Foodsmart that Plaintiff (according to him) requested not to be contacted further. Finally, Plaintiff's internal DNC claim fails because it is undisputed that both Foodsmart and QCS had the requisite internal DNC policies to avail themselves of the internal DNC rules' safe harbor. Foodsmart respectfully requests the Court grant its motion for summary judgment and enter judgment in its favor on Plaintiff's claims.

Dated: November 7, 2023

Respectfully submitted,

*/s/ Ryan D. Watstein*

Ryan D. Watstein
James M. Ruley
WATSTEIN TEREPKA LLP
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
E-mail: ryan@wtlaw.com
E-mail: jruley@wtlaw.com

Maria DelPizzo Sanders
State Bar No. 1031037
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
Telephone: 414.221.6652
E-mail: maria.sanders@vonbriesen.com

*Attorneys for Defendant Zipongo, Inc. d/b/a Foodsmart*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2023, I caused to be electronically filed the foregoing document in the United States District Court for the Eastern District of Wisconsin, with notice of same being electronically served by the CM/ECF system, to all attorneys of record.

*/s/ James M. Ruley*
James M. Ruley