UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

JAMES HULCE, et al.,

    Plaintiff,

v.

ZIPONGO, INC. d/b/a FOODSMART,

    Defendant.

Case No. 2:23-cv-00159-LA

# FOODSMART'S PROPOSED FINDINGS OF FACT IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

1

Defendant Zipongo, Inc. d/b/a Foodsmart ("Foodsmart") hereby submits the following Proposed Findings of Fact in support of its Motion for Summary Judgment.

1. Foodsmart is a mission driven company that provides nutritional telehealth consultations to help individuals improve their overall health and to combat food insecurity. Declaration of Jared Scharen at ¶ 4 (attached hereto as Exhibit A).

2. Food insecurity is a serious problem for over 17,000,000 Americans who are unable to acquire enough food. "Key Statistics & Graphics" USDA, available at https://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-u-s/key-statistics-graphics /#food secure (last accessed November 7, 2023) ("12.8 percent (17.0 million) of U.S. households were food insecure at some time during 2022").

3. Foodsmart works with healthcare plans and providers across the country to facilitate telehealth nutritional visits. Ex A. at ¶ 5.

4. During these visits, Foodsmart integrates dietary assessments and nutrition counseling from dietitians with cost-effective meal planning for the whole family. *Id.* at ¶ 6.

5. Foodsmart devotes substantial resources to help eligible insurance plan members battle food insecurity by helping them enroll in government assistance programs, such as SNAP, for low-income individuals. *Id.* at ¶ 7.

6. Research studies on Foodsmart's programs show that its preventative services not only benefit members by improving their nutritional choices (and their overall health) but also decrease overall healthcare costs for healthcare providers and the state. *Id.* at ¶¶ 8-10; 2022 Optum Claims Study at 2 (attached as Exhibit 1 to Ex. A, Scharen Decl.) ("Foodsmart saved the health plan, on average, $40 PMPM [per member per month] after adjusting for high value claims and other wellness programs, compared to a matched control group."); Foodsmart CCHP Study at 1

(attached as Exhibit 2 to Scharen Decl.) ("the average 12 month PMPM claims savings generated by Foodsmart across major chronic conditions compared to controls: savings ranged from $62 to $871 PMPM in some members.").

7. Chorus Community Health Plans ("CCHP"), a Wisconsin based healthcare provider, contracted with Foodsmart to provide nutritional services to its plan members. Ex. A at ¶ 11.

8. CCHP specifically chose to contract with Foodsmart to better serve its large number of plan members who receive services through Badgercare Plus, a state-run and state-funded Medicaid plan. *Id.* at ¶ 12.

9. To qualify for this Medicaid program, members must either be low income or have a qualifying disability, making easily accessible telehealth nutritional plans a top priority to help address those members' overall health and struggles with food insecurity. *Id.* at ¶ 14.

10. Because Badgercare Plus is a state funded healthcare program, members pay nothing for the services they receive through CCHP by means of a monthly premium, copay, or otherwise. *Id.* at ¶ 13; Deposition of James C. Hulce at 37 (attached hereto as Exhibit B).

11. To facilitate the provision of its free services, Foodsmart sends informational text messages and phone calls to CCHP members. Ex. A at ¶ 15.

12. Foodsmart sends these communications after they are approved by the state of Wisconsin. *Id.* at ¶ 16.

13. Foodsmart also conducts gift card giveaways and raffles to help low-income members buy healthy groceries. *Id.* at ¶ 17.

14. The text messages at issue here, which are sent directly by Foodsmart, expressly provide that Foodsmart's services are free and offer to help CCHP members set up appointments to assess and improve their nutritional health. *Id.* at ¶ 18.

15. The sole text message sent to Plaintiff provided that CCHP members can receive free $25 gift cards for completing a "no cost" visit and taking the Foodsmart Nutriquiz, a dietary tool designed to health members develop healthy eating habits. *Id.* at ¶ 19.

16. Recipients of these messages who no longer wished to receive these messages could easily opt out by responding "stop," to opt out. *Id.*

17. Foodsmart calls CCHP members through its vendor, Quality Contact Services ("QCS"). *Id.* at ¶ 20; Declaration of Richard Hamilton at ¶ 4 (attached hereto as Exhibit C).

18. At the start of every outbound call, QCS informs members that the services are being offered to them for free through their healthcare provider. Ex. C at ¶ 5.

19. QCS lacks the ability to even take or process payments if it accidentally reaches an ineligible individual. *Id.* at ¶ 8.

20. If an individual who wasn't a CCHP member received an outbound call from QCS by mistake (which could occur for numerous reasons, including because the eligibility file had not yet been updated after a member changed insurance plans), upon learning that they weren't a CCHP member, and thus ineligible for the program, the QCS representative would terminate the call. *Id.* at ¶ 6.

21. Foodsmart requires QCS to honor all do-not-call ("DNC") requests, meaning if someone says "do not contact me again" or something similar, QCS is not permitted to make any further calls and must notify Foodsmart immediately so Foodsmart knows not to text the consumer. *Id* at ¶ 7; Ex. A. at ¶¶ 21-23.

22. Both entities (Foodsmart and QCS) have implemented policies requiring the immediate honoring of such DNC requests, train their employees on them, and honor such requests indefinitely. Ex. A at ¶¶ 27-31; Ex. C at ¶¶ 11-15.

23. These policies and procedures include: (1) maintaining internal, written DNC policies that are available on demand; (2) training employees on the existence and use of the DNC policy; (3) honoring all DNC requests; (4) maintaining records of all requests not to be contacted and honoring those requests for at least 5 years from the time they are made; and (5) identifying on each call, the name of the individual caller making the call, that the call was made on behalf of Foodsmart, and providing the telephone number and address at which the entity could be contacted, if requested. *See* Ex. A at ¶¶ 27-31; Ex. C at ¶¶ 11-15.

24. Plaintiff applied and was approved for the state-funded Badgercare Plus Medicaid program and began receiving completely free, state-funded healthcare in September 2021. Ex. B at 36-37.

25. Plaintiff received a single text message directly from Foodsmart in October 2022. *Id.* at 59.

26. Plaintiff responded "stop" to "unsubscribe" from further texts, as the text he received instructed he could do. Ex. A at ¶ 24.

27. He was promptly removed from the text-message list and wasn't texted again. *Id.*

28. Plaintiff was first called by QCS in December 2021, and then again in February 2022. During both of these calls he spoke to a live agent. Ex. C at ¶ 9; Ex. 1 to Ex. C.

29. Plaintiff testified that during those calls he asked not to be contacted further about Foodsmart's services. Ex. B at 73-74.

30. The call record disposition notes only show that Plaintiff wasn't interested in Foodsmart's free services at that time. Ex. C at ¶ 9.

31. QCS never notified Foodsmart that Plaintiff wasn't interested in Foodsmart's services. Ex. A at ¶ 23.

32. Plaintiff received four additional phone calls from QCS in the late spring of 2022, all of which went unanswered. Ex. C at ¶ 9; Ex. 1 to Ex. C.

33. In November 2022, Plaintiff sent CCHP (not QCS or Foodsmart) a "grievance letter" asking not to be contacted about Foodsmart's service. Ex. B at 75.

34. The letter was never transmitted to Foodsmart or QCS, and so Plaintiff's number was not placed on QCS's or Foodsmart's internal DNC list. Ex. A at ¶ 26; Ex. C at ¶ 10.

35. For reasons unrelated to this lawsuit, Plaintiff terminated his CCHP insurance effective November 30, 2022. Ex. B at 38-39.

36. Plaintiff thereafter received three additional phone calls from QCS about thirty days after his termination of his CCHP plan: on January 3, 4, and 5, each of which went directly to voicemail. *Id.* at 70-71.

37. Plaintiff received these communications because the eligibility list (showing he was no longer a CCHP member) hadn't yet been updated in the short time window following the cancellation of his insurance. Ex. A at ¶ 25.

Dated: November 7, 2023

[SIGNATURE PAGE TO FOLLOW]

Respectfully submitted,

/s/ Ryan D. Watstein
Ryan D. Watstein
James M. Ruley
WATSTEIN TEREPKA LLP
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
E-mail: ryan@wtlaw.com
E-mail: jruley@wtlaw.com

Maria DelPizzo Sanders
State Bar No. 1031037
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
Telephone: 414.221.6652
E-mail: maria.sanders@vonbriesen.com

*Attorneys for Defendant Zipongo, Inc. d/b/a Foodsmart*

**CERTIFICATE OF SERVICE**

      I hereby certify that on November 7, 2023, I electronically filed the foregoing document in the United States District Court for the Eastern District of Wisconsin, with notice of same being electronically served by the CM/ECF system, to all attorneys of record.

                                                  /s/ Ryan D. Watstein
                                                  Ryan D. Watstein