**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| JAMES C. HULCE, individually and on behalf of a class of all persons and entities similarly situated, | : | Case No. 2:23-cv-00159-LA |
| | : | Judge Lynn Adelman |
| Plaintiff, | : | |
| v. | : | |
| ZIPONGO, INC. dba FOODSMART, | : | |
| Defendant. | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT ZIPONGO, INC. D/B/A FOODSMART'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Foodsmart is not entitled to summary judgment. The Telephone Consumer Protection Act ("TCPA") does not require the recipient of a call to pay out of pocket for the good or service being promoted for the call to be telemarketing. Rather, a third party may purchase the good or service on the plaintiff's behalf, as would have been the case here had Foodsmart's sales pitch to Plaintiff been successful. The calls and texts to Plaintiff specifically encouraged him to use Foodsmart's services by setting up a telehealth visit with a Foodsmart dietician. Had he done so, Foodsmart would have separately billed Plaintiff's Health Maintenance Organization ("HMO") for that visit and Plaintiff's HMO would have paid Foodsmart for it on his behalf.

Moreover, summary judgment is particularly inappropriate here because the inquiry into what constitutes telemarketing is a fact-intensive inquiry focusing on the purpose of the call, not merely its content. Here, there is abundant evidence that Foodsmart's calls and texts were driven by economic motivations to encourage consumers to use its services, thereby directly earning Foodsmart revenue. Foodsmart's marketing campaign was aggressive and unrelenting despite

Plaintiff's repeated attempts to get the calls to stop. Not surprisingly, Foodsmart repeatedly referred to its campaigns internally as "marketing" and "text marketing." In the face of such evidence, a jury would not find Foodsmart's litigation argument that its texts were mere "informational notices" to be credible. For the foregoing reasons, and others described below, Foodsmart's Motion for Summary Judgment should be DENIED.

## STATEMENT OF FACTS

Foodsmart is a for-profit business that operates a platform that connects consumers with dieticians. (30(b)(6) Deposition of Jared Scharen on behalf of Foodsmart ("Scharen Dep."), attached to Declaration of Jonathan P. Misny (Doc. 32) as Exhibit A, 12:4-7.) It is not a tax-exempt nonprofit organization so as to be exempted from the TCPA's Do Not Call provisions. *See* 47 U.S.C. § 227(a)(4).

Plaintiff James Hulce is an individual consumer. Around the summer of 2021 he became a member of "BadgerCare Plus," a state insurance program that primarily uses a HMO-based health coverage model. (Deposition of James C. Hulce ("Hulce Dep."), attached to Declaration of Jonathan P. Misny (Doc. 32) as Exhibit B, 37:15-38:5.) Chorus Community Healthcare Plans ("CCHP") was the initial HMO that Plaintiff selected. (*Id.*)

Foodsmart entered into a Master Services Agreement with CCHP on February 11, 2021 to provide its services to members of CCHP. (Scharen Dep., Ex. 3, § 2.1.) Foodsmart and CCHP agreed in a section of their Agreement titled "**MARKETING**" that there would be "**Marketing Team Collaboration**," to include a [redacted] (*Id.*, Ex. 3, § 6.2.) Those "marketing

materials" included scripts for outbound calls and the content of text messages. (*Id.*, 31:3-13.) The Foodsmart Service Order accompanying the Master Services Agreement further set forth "**Implementation and Marketing Requirements**" that included an [redacted] and requirements that [redacted] (*Id.*, Ex. 4.)

Indeed, to generate new business, Foodsmart engages in aggressive multi-channel marketing campaigns which include outbound calls and text messages along with other promotional materials such as flyers, emails, and postal mailings. (Hulce Dep., 44:17-25.) Plaintiff received all of these types of communications. (*Id.*)

Between 2021 and 2022, Plaintiff received approximately 20 calls from callers calling on behalf of Foodsmart. (*Id.*, Ex. 2, Interrogatory No. 2.) These included calls on May 17, 2022, June 4, 2022, June 7, 2022, December 7, 2022 and December 12, 2022. (*Id.*, 60:5-70:4, Ex. 5.) On some of these calls, the caller left a voicemail, while on others they did not. (*Id.*) On June 4, 2022, the caller from caller ID (715) 364-5026 left a voicemail soliciting Plaintiff to sign up for a telehealth visit and complete a nutritional assessment:

> Hi James, this is Cassandra. I'm calling on behalf of the Children's Community Health Plan and Foodsmart to let you know about a giveaway we are currently running as part of your CCHP membership. You could be entered to $100 by participating in the zero cost Telehealth visit and completing a nutritional assessment. Please call us back at 414-966-4599 as soon as possible so we can get you entered into the giveaway.

(*Id.*, Ex. 5.) Plaintiff received a call from that same caller ID on June 7, 2022 but the caller did not leave a voicemail. (*Id.*) During the summer months of 2022, beginning around June 2022, Plaintiff spoke with live callers at least five times, in some cases telling the caller he was not interested or was already receiving care from another registered dietician and in some cases requesting to be removed from their marketing lists or calling lists. (*Id.*, 73:12-74:13-75:7.)

Plaintiff also received text messages from Foodsmart. On October 27, 2022, Plaintiff received the following text:




(*Id.*, Ex. 4.) Plaintiff replied "STOP" but was still sent another text that stated: "You have been opted-out of receiving text messages from Foodsmart. Remember, you can still log in to set up a free consultation with a nutrition coach to help you eat healthier." (*Id.*) Foodsmart now contends these texts were not telemarketing but internally it referred to such texts as "Text Marketing." (Scharen Dep., Ex. 13, p. 3.)

Plaintiff sent CCHP a Formal Grievance Notice over the calls on November 10, 2022, informing CCHP that he was receiving "countless marketing communications regarding the Foodsmart Nutrition Program via phone calls, text messages, email and postal mail" despite requesting to be removed from Foodsmart marketing lists. (Hulce Dep., Ex. 6.) CCHP

responded that "Chorus Community Health Plans completes the telephone and mailing portion of the *marketing outreach*, and Foodsmart completes the text and email portion." (Scharen Dep., Ex. 17) (emphasis added). Foodsmart contends that is inaccurate because while Foodsmart does send text messages directly, it has a company called Quality Control Services ("QCS") place outbound calls on its behalf. (*Id.*, 96:1-97:4.) QCS makes calls at Foodsmart's direction. Foodsmart instructs QCS on "who they should call, and jointly agree on the context of … what they should generally say in the conversation." (*Id.*, 17:16-18:10.) CCHP further stated in its responsive letter: "Our Health Promotion Program Manager verified with Foodsmart that they updated their system to discontinue your texts and emails, however, there was a disconnection in your request being relayed to us. As a result, you continued to receive the telephone calls and letters by mail. The Health Promotion Program Manager also confirmed that a system is being put in place between our organizations to improve communications on member requests." (*Id.*, Ex. 17.) Foodsmart disputes this, claiming none of this was true and that CCHP never notified Foodsmart of Plaintiff's grievance or Do Not Call request. (*Id.*, 96:1-98:10; 102:4-104:13.)

Effective November 30, 2022, Plaintiff's membership in the BadgerCare Plus HMO Program ended for a reason unrelated to the calls and texts from Foodsmart. (Hulce Dep., 38:21-39:18.) Nonetheless, Plaintiff still proceeded to receive more calls from Foodsmart.

On January 3, 2023, the caller from caller ID (715) 364-5026 left the following voicemail:

> Hi, my name is Shirley. I'm calling on behalf of your health plan Chorus Community Health Plan and Foodsmart to let you know about an exciting promotion members who meet with the nutrition coach paid for it by your health plan will be entered to win a $100 Walmart gift card. This is on top of the guarantee $25 grocery gift card you can receive for completing your first appointment. Please call us back at 877-526-0894 as soon as possible so we can get you

> scheduled. I look forward to speaking to you soon. Have a good day.

(*Id.*, Ex. 5.)

On January 4, 2023, Plaintiff received a similar voicemail from the same caller ID:

> Hi James, this is Jessica. I'm calling on behalf of your health plan Chorus Community Health Plan and Foodsmart to let you know about an exciting promotion members who meet with the nutrition coach paid for by your health plan will be entered into $100 Walmart gift card. This is on top of the guaranteed $25 grocery gift card that you would receive for completing your first appointment. Please call us back as soon as possible so we can get your scheduled [appointments] are filling up fast, and I look forward to speaking to you soon. Have a great day.

(*Id.*) The same caller ID called Plaintiff again the next day asking to speak with him. (*Id.*)

While these voicemails refer to meeting with a "nutrition coach paid for by your health plan," the June 2022 voicemail referred to a "zero cost telehealth visit" and the October 2022 text messages referred to a "no cost visit" and a "free consultation," Foodsmart was directly compensated for providing these services—the money just did not come out of the consumer's pocket. Rather, CCHP specifically paid Foodsmart for each of these services on its members', such as Plaintiff's, behalf.

CCHP had both "Commercial members" and "Medicaid members." For each type of member, Foodsmart followed the same process of billing CCHP for telenutrition visits separately and individually through claims. (Scharen Dep., Ex. 4.) "When someone meets with a dietician, a claim is submitted from Foodsmart that's sent to the health plan to reimburse Foodsmart for the services offered" and Foodsmart is compensated separately for each visit that a CCHP member would have with a dietician[1]. (*Id.*, 36:12-37:13.) For Commercial members, Foodsmart also

[1] Foodsmart both employs and enters into independent contractor relationships with registered dieticians. (Scharen Dep., 39:1-11.)

used Subscription Pricing whereby CCHP paid Foodsmart a fee per eligible member per month, irrespective of whether the consumer used the service. (*Id.*, Ex. 4, 34:14-34:22.) For Medicaid members such as Plaintiff, Foodsmart also used Utilization Based Pricing, whereby CCHP paid Foodsmart a fee per enrolled user [a user who either signs up for the app or meets with a dietician] per year. (*Id.*, Ex. 4, 34:23-35:18.) The more users that enrolled with Foodsmart, the more revenue Foodsmart would earn from CCHP. (*Id.*, 35:19-36:16.) Foodsmart's Service Order with CCHP also included bonuses such as [redacted] (*Id.*, Ex. 4.)

As such, Foodsmart's services were not being provided for "free," CCHP was just paying for them on the member's behalf. At one point, [redacted] (*Id.*, Ex. 7.) Foodsmart acknowledged these were two ways of saying the same thing: "Your health plan is paying for this so it's free to you…." (*Id.*, 60:15-61:1.)

Foodsmart's services are also available to the general public. (*Id.*, 56:10-24.) Anyone can enroll and schedule telenutrition visits and pay for them out of pocket. (*Id.*)

Plaintiff sent a second Formal Grievance Notice to CCHP on January 7, 2023 and ultimately filed this lawsuit for violation of the TCPA's Do Not Call provisions. (Hulce Dep., Ex. 6.) Plaintiff found Foodsmart's telemarketing particularly annoying and offensive because:

> I … was growing annoyed with the marketing and outreach related to the Foodsmart program. I had never before seen that kind of intense multimodal outreach from a health care provider, and I didn't really feel like that was appropriate for a health care setting. I had associated those kind of behaviors before with more high-

> pressure sales, which is not really, in my mind, appropriate for a health care provider to do.

(*Id.*, 78:13-21.)

Indeed, Plaintiff was right to associate Foodsmart with high-pressure sales because marketing is a major component of Foodsmart's business. From a quick glance at Foodsmart's organizational chart, the Court can see that roughly one third (20 out of 60) of the company's employees hold "marketing" positions, including Foodsmart's 30(b)(6) representative Jared Scharen - Senior Vice President of Marketing", Trevor Keating – "Director Growth Marketing", and Chad DeVos – "Product Marketing Manager." (Scharen Dep., Ex. 2.)

Further demonstrating the aggressiveness of Foodsmart's telemarketing campaigns, Foodsmart armed its salespeople with extensive rebuttals to consumers who said they weren't interested and continued to call "cycled leads" [redacted] (*Id.*, Ex. 8[2], pp. 7-8, Ex. 15.)

Moreover, further cutting against Foodsmart's contention its campaigns were mere "informational notices," Foodsmart's Vice President of Marketing celebrated a successful campaign by calling it a "kick ass [ ] campaign" and boasted [redacted] (*Id.*, Ex. 12.) He explained, "Do we also receive revenue from this so we can pay our dieticians and keep our lights on and continue expanding what we do? Yeah, we're a business." (*Id.*, 75:19-22.)

---

[2] Foodsmart designated its call scripts as Confidential and is requiring Plaintiff to move to file them under seal because according to Foodsmart they purportedly contain "confidential business information," the public disclosure of which would harm Foodsmart's business. This highlights the commercial purpose of the calls and weighs in favor of deeming the calls telemarketing.

Foodsmart admits it made no effort to scrub its calling lists for campaigns to CCHP members for phone numbers on the National Do Not Call Registry. (*Id.*, 106:6.) Plaintiff brings this class action on behalf of similarly situated individuals that received unlawful telemarketing calls from or on behalf of Foodsmart for calling him and other putative class members without their prior express written consent despite their numbers being listed on the National Do Not Call Registry and for failing to maintain adequate procedures to maintain an internal Do Not Call list. (*See* Doc. 1, ¶ 51.)

## LAW AND ARGUMENT

### I. Foodsmart's calls and texts were telephone solicitations.

a. *The plain language of the definition of "telephone solicitations" does not require Plaintiff to be the one that pays.*

The TCPA's Do Not Call Provisions apply to "telephone solicitations." 47 C.F.R. § 64.1200(c)(2). *See also* 47 U.S.C. § 227(c)(1). The TCPA defines a "telephone solicitation" as:

> the initiation of a telephone call or message *for the purpose of encouraging the purchase or rental of*, or investment in, property, goods, *or services*, which is transmitted *to any person*, but such term does not include a call or message: (A) to any person with that person's prior express invitation or permission; (B) to any person with whom the caller has an established business relationship or (C) by or on behalf of a tax-exempt nonprofit organization.

47 U.S.C. § 227(a)(4) (emphasis added). *See also* 47 C.F.R. § 64.1200(f)(15) (same definition). Notably, the definition of "telephone solicitation" is identical to the definition of the term "telemarketing," applicable to other provisions of the TCPA, except the definition of telemarketing does not include the three exceptions set forth above in 47 U.S.C. § 227(a)(4) and 47 C.F.R. § 64.1200(f)(15). 47 C.F.R. § 64.1200(f)(13). Foodsmart does not contend any of those three exceptions apply here, meaning for purposes of Foodsmart's Motion, a "telephone solicitation" and "telemarketing" are essentially synonymous.

The plain language of the statute does not require the recipient of the call to directly pay out of pocket for the property, good, or service that's purchase is being encouraged. Rather, the definition intentionally uses the passive voice ("encouraging *the purchase or rental of* … property, goods, or services") without specifying who has to make the purchase and then states that the call or message can be transmitted "to *any* person"—not only the person that is directly paying in the purchase transaction.

Case law is in accord, as courts have repeatedly been careful to state that encouraging a purchase—not necessarily to be paid for directly by the recipient of the call—is all that is required for a call to be telemarketing. *See, e.g.*, *Mantha v. Quotewizard.com, LLC*, No. 19-12235-LTS1, 2021 U.S. Dist. LEXIS 245059, at *20 (D. Mass. Dec. 3, 2021) (communications were telemarketing where they were "for the purpose of encouraging *a purchase of services*" because "[t]he definition of telephone solicitation *does not require the party initiating contact to be directly offering a sale*, rather 'referring a consumer to another entity is a prohibited purpose if the purpose of the referral is to encourage a purchase, even if a purchase from another entity or a future purchase[3].'") (quoting *Panacci v. Al Solar Power, Inc.*, No. 15-cv-00532, 2015 U.S. Dist. LEXIS 77294, at *16 (N.D. Cal. June 15, 2015) (itself citing the plain language of 47 U.S.C. § 227(a)) (emphasis added); *Whittaker v. Freeway Ins. Servs. Am., Ltd. Liab. Co.*, No. CV-22-8042-PCT-DGC, 2023 U.S. Dist. LEXIS 6018, at *5-6 (D. Ariz. Jan. 12, 2023) ("Except for encouraging *the purchase of its products*, it is hard to imagine why an insurance company would contact a consumer not already insured by it and state that it looked forward to saving the consumer money, as did the recorded message in this case."); *Chinitz v. NRT W., Inc.*, No. 18-cv-06100-NC, 2019 U.S. Dist. LEXIS 27134, at *6 (N.D. Cal. Feb. 20, 2019) ("He also alleged that

[3] Indeed, there is no requirement that the caller has to be able to effectuate a purchase by accepting payment over the phone—the call may encourage a future purchase.

an agent of NRT admitted to placing the robocalls *in order to generate business*. *Id.* ¶ 31. From these facts, the Court can plausibly infer that the purpose of the calls was to encourage *the purchase of* NRT's services, *i.e.*, telemarketing.) (emphasis added); *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015) ("'Telemarketing' occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services."). Foodsmart cites to no case interpreting the definition of "telephone solicitation" or "telemarketing" to require the recipient of the call to pay out of pocket.

Additionally, as a remedial statute, the TCPA should be interpreted broadly in favor of consumers and the Court should not rewrite the statute to impose requirements that are not in its plain language. *See Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 967 (7th Cir. 2020) ("The TCPA is a remedial statute that we must liberally construe in favor of consumer protection.")

The plain language of the statute alone is dispositive of Foodsmart's motion. It is undisputed that Foodsmart's calls and texts encourage the recipient to set up an appointment with a Foodsmart dietician and that Plaintiff's HMO, CCHP, directly pays Foodsmart for that appointment. At the time of each appointment, Foodsmart bills CCHP for that appointment, and CCHP pays for it on its member's behalf.

Though resort to legislative history is unnecessary here where the statute is unambiguous, it, too, is in accord with Plaintiff's reading that Plaintiff does not have to be the one that pays out of pocket for the service. The TCPA was referred to the House Committee on Energy and Commerce. *Camunas v. Natl. Republican Senatorial Commt.*, 570 F. Supp. 3d 288, 299 (E.D.Pa. 2021). The Committee's report explained that, as opposed to requiring the caller to encourage a direct sale to the recipient who pays the seller directly, "[t]o come within the definition [of

telephone solicitation], a caller must encourage *a commercial transaction*…." (*Id.* (quoting *Comm. on Energy and Commerce*, H.R. Rep. No. 102-317, at 13 (1991).) Moreover, demonstrating a broad reading of what a "commercial transaction" is, the Committee then contrasted that term with situations where no money is exchanged at all, stating: "the Committee 'does not intend the term 'telephone solicitation' to include public opinion polling, consumer or market surveys, or other survey research conducted by telephone.'" *Id.* Foodsmart's calls were not akin to polling, surveys, or research.

The FCC's interpretation of "telephone solicitation" likewise does not require the "purchase" encouraged on the call to be paid for by call recipient. Instead, the FCC views the definition of "telephone solicitation" as protecting against companies attempting to characterize telemarketing calls as "free offers." The FCC amended its prerecorded message rule to apply not just to "unsolicited advertisements" but also to "telephone solicitations" because:

> We agree with those commenters who suggest that application of the prerecorded message rule should turn, *not on the caller's characterization of the call*, but on the purpose of the message. *Amending the rule to apply to messages that constitute "telephone solicitations" is consistent with the goals of the TCPA and addresses the concerns raised by commenters about purported "free offers."*

In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd 14014, 225 (F.C.C. June 26, 2003) (emphasis added). Those purported "free offers," the FCC explained, were "offers for free goods and services that are *part of an overall marketing campaign* to sell property, goods, or services…." (*Id.* at 223.)

Foodsmart's case law is inapposite. The court in *Trujillo v. Free Energy Sav. Co., LLC*, expressly *did* "*not* resolve the question of whether a call or message must aim to encourage the recipient [to purchase, rent, or invest]." *Trujillo v. Free Energy Sav. Co., LLC*, 2020 WL 7768722, at *2-3 (C.D. Cal. Dec. 21, 2020). The court did not need to do so because the

plaintiff's theory was merely that the defendant had an implicit, general, economic motive, but the plaintiff did not produce any evidence giving rise to a reasonable inference of encouragement of a purchase, rental, or investment *by anyone*. *Id*. Here, the calls encouraged Plaintiff to sign up for Foodsmart's services which would be directly paid for by CCHP on his behalf. Moreover, unlike here, the calls in *Trujillo* were made pursuant to the utility companies' obligations under the California Public Utilities Code and the Energy Savings Assistance Program and discussed services that were not available to the public. *Spiegel v. Reynolds* involved calls that encouraged the complete opposite of a purchase – a donation from the recipient of the call. *Spiegel v. Reynolds*, No. 15 C 8504, 2017 U.S. Dist. LEXIS 167777, at *13-14 (N.D. Ill. Oct. 11, 2017). The court emphasized that the plaintiff's argument that the donation "will *eventually* be used to purchase goods or services for someone else" was too expansive of an interpretation of the statute. *Id.* at *13 (emphasis in original). Here, the purchase is not some uncertain, eventual, future purchase by Foodsmart itself but a direct and current purchase of Foodsmart's services that just happens to be paid for by CCHP on Plaintiff's behalf. In *Morris v. Unitedhealthcare Ins. Co.*, the plaintiff argued that the purpose of the informational calls at issue was to retain customers by increasing the perceived value of the plaintiff's health insurance plan's services, but the "[p]laintiff proffer[ed] no evidence in support of such conclusion." *Morris v. Unitedhealthcare Ins. Co.*, No. 4:15-CV-00638-ALM-CAN, 2016 U.S. Dist. LEXIS 168288, *26 (E.D. Tex. Nov. 8, 2016). Here, Plaintiff has cited to evidence that the purpose of the calls was to encourage the recipient to sign up for Foodsmart's services, which CCHP directly purchases from Foodsmart for CCHP's members such as Plaintiff on their behalf. Foodsmart directly profits from the purchase when the recipient of the call does so, unlike the attenuated and unsupported argument in *Morris* that the calls were commercially advantageous because there

may have been some undefined incremental increase in the perceived value of membership in the health insurance plan. Finally, in *Friedman v. Torchmark Corp.*, the Court found the messages at issue were not "unsoliciated advertisements" because rather than advertising the commercial availability of property, goods, or services, they involved an offer to the recipient of the call to attend a recruiting webinar and potentially enter into an independent contractor relationship to sell the defendant's products. *Friedman v. Torchmark Corp.*, No. 12-CV-2837-IEG (BGS), 2013 U.S. Dist. LEXIS 114321, at *13-15 (S.D. Cal. Aug. 13, 2013). Here, Plaintiff was not solicited to sell Foodsmart's services but to sign up for them himself.

b. *Foodsmart's calls and texts were for the purpose of generating business and revenue for it.*

The purpose of the call, rather than its content, controls whether it is "telemarketing." *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015). "Where the implication of an improper purpose is clear from the context, the TCPA does not 'require an explicit mention of a good, product or service.'" *Payton v. Kale Realty, Ltd. Liab. Co.*, 164 F. Supp. 3d 1050, 1062-63 (N.D. Ill. 2016) (quoting *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).) Courts "may look to the context of the message to assess whether it satisfies the definition of 'telephone solicitations.'" *Visco v. Creditors Relief, LLC*, No. 20-cv-12303-DJC, 2022 U.S. Dist. LEXIS 28908, at *13-14 (D. Mass. Feb. 17, 2022). The purpose of a call is a question of fact. *Shupe v. Capital One Bank USA NA*, No. CV-16-00571-TUC-JGZ, 2018 U.S. Dist. LEXIS 183456, at *13-14 (D. Ariz. Oct. 25, 2018).

Here, the context of the calls is that they were part of an aggressive self-described "marketing" strategy to promote Foodsmart's core business and earn revenue from purchases of Foodsmart's services made for and on behalf of CCHP's members. Taking Plaintiff as an example, Foodsmart repeatedly called him and also texted him attempting to get him to enroll in

Foodsmart's platform and set up an appointment with a dietician. Virtually everyone involved in the campaign had "Marketing" in their job title and Foodsmart repeatedly called the communications "marketing," including in the contract documents between Foodsmart and CCHP. The callers were trained to persist even when consumers said they were not interested and Foodsmart continued to call on people that had already told Foodsmart over the phone they weren't interested. Foodsmart's Vice President of Marketing acknowledged that his excitement over what he called a "kick ass [calling] campaign" was in part because it meant Foodsmart was earning more revenue that could be used to continue to grow the company.

The facts of this case are similar to *Carlton v. PDR Network, LLC*, 80 F.4th 466 (4th Cir. 2023) in that in *Carlton*, the defendant would receive payment from a third party after a successful sales pitch. While the case involved a question of whether faxes were "unsolicited advertisements," as described above, the FCC views "telephone solicitations" as a broader term that offers consumers greater protection against so-called "free offers" and focuses on the underlying purpose of the communication. In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd 14014, 225 (F.C.C. June 26, 2003) (emphasis added). The Fourth Circuit explained:

> But nothing in the text of the TCPA or in general usage limits the "concept . . . [of] commercial," *Sandusky*, 788 F.3d at 224 (emphasis omitted), to direct sales. *See, e.g., id.* at 222 (defining "commercial" as "of, in, or relating to commerce," "from the point of view of profit," and "something that *relates* to buying and selling" (emphasis added) (internal quotation marks omitted)). The plaintiff alleges that PDR Network is paid when it places a free eBook via fax. *That the payment comes from a drug company rather than the fax recipient - that PDR Network is effectively selling space in its* Physicians' Desk Reference *rather than eBooks - does not, we think, strip the transaction of its "commercial" character*. *See PDR I*, 883 F.3d at 468 (requiring that fax on its face propose specific commercial transaction "ignores the reality of many modern business models").

> To be clear, it is not PDR Network's alleged profit motive alone that gives its faxes the requisite commercial character under the TCPA. A purely informational fax - one that does not tout the "quality of any property, goods, or services," 47 U.S.C. § 227(a)(5) - would not [**18] qualify as an "unsolicited advertisement" even if the sender hoped to profit "through branding, goodwill, or other indirect effects." *BPP*, 53 F.4th at 1113. The FCC has endorsed that reading, clarifying that faxes "that contain only information, such as industry news articles, legislative updates, or employee benefit information" are not prohibited by the TCPA, 2006 FCC Rule, 71 Fed. Reg. at 25973, and courts have relied on it in rejecting allegations that informational faxes might produce "financial[] benefit" for their senders "several locks down the stream of commerce," *see Sandusky*, 788 F.3d at 225. *But here, at least as alleged, [*477] we have not just profit, but also a pitch: PDR Network's fax touts the virtues and "quality" of the eBook, and if that pitch is successful, PDR Network profits by way of commission. It is that combination, we conclude, that makes the fax in question sufficiently commercial to qualify as an "advertisement" under the TCPA.* We suggested as much in *PDR I, see* 883 F.3d at 468, and our view has not changed.
>
> So understood, our holding does not conflict with the cases cited by PDR Network, in which courts have dismissed complaints that allege only a more attenuated or, in the words of the district court, "ancillary" relationship between a fax and potential [**19] profit to the sender. *See PDR III*, 2022 U.S. Dist. LEXIS 22371, 2022 WL 386097, at *7.

*Carlton v. PDR Network, LLC*, 80 F.4th 466, 476-77 (4th Cir. 2023) (emphasis added). The argument that the communications are telemarketing is stronger here because if Foodmsart's sales pitch is successful, there is a specific purchase of Foodsmart's services that is paid for by CCHP on Plaintiff's behalf and Foodsmart earns not mere "commission" but payment for its services as it would if any member of the public were to sign up and pay out of pocket for them, which they can do.

Foodsmart attempts to avoid the conclusion that its communications are telemarketing by attempting to paint itself as a charitable organization, repeatedly touting its mission to help low-

income and food insecure individuals. Plaintiff does not contest that those are worthy objectives but does note that the TCPA does not include an exception for businesses that aim to improve the wellbeing of the public. Rather, the TCPA's DNC provisions only include an exception for "tax exempt nonprofit organizations." 47 U.S.C. § 227(a)(4)(C). Foodsmart is a for-profit business, therefore this exception does not apply. Indeed, many businesses offer services that aim to improve people's nutrition or generally have worthy missions in addition to their goal to be profitable, but they are not exempt from the TCPA unless they are tax-exempt non-profits. Foodsmart asks the Court to be treated like one despite not indisputably not falling into the express exemption in the TCPA.

Similarly, Foodsmart repeatedly calls the communications at issue "healthcare" calls, but the TCPA's DNC provisions do not include a "healthcare" exception. The only exceptions are the non-profit exception described above, an exception for entities that have an established business relationship with the consumer, and calls with the recipient's prior express invitation or permission. 47 U.S.C. § 227(a)(4)(C). The TCPA's autodialing provisions do contain less demanding consent requirements for "healthcare" messages, but the DNC provisions do not contain a similar provision, nor does Foodsmart contend it has the requisite consent from Plaintiff to satisfy the standard to send autodialed "healthcare" messages. Therefore, Foodsmart's characterization of its calls as healthcare calls is inapposite. Even so, to be sure, Foodsmart's calls are far from meeting the standard for "healthcare" messages applicable to the TCPA's autodialing provisions. The FCC has determined that healthcare messages are restricted to "calls for which there is exigency and that have a healthcare treatment purpose, specifically: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent

readmission, prescription notifications, and home healthcare instructions." In re Rules & Regulations Implementing the TCP Act of 1991 et al., 30 FCC Rcd 7961, 8031, ¶ 146 (F.C.C. July 10, 2015). Foodsmart does not argue its calls are any of these. And, the FCC has specified that excluded from the definition of healthcare messages are communications, like Foodsmart's, "contained therein that include telemarketing, solicitation, or advertising content…." *Id. See also Sullivan v. All Web Leads, Inc.*, No. 17 C 1307, 2017 U.S. Dist. LEXIS 84232, at *12-15 (N.D. Ill. June 1, 2017) ("Applying these factors to this case leads inescapably to the conclusion that All Web's lead-generating calls are not 'health care messages.' First, such calls are not inarguably health-related; rather, they smack of messages designed to promote a product simply because it may be construed to benefit a consumer's health. Second, All Web does not autodial consumers by or on behalf of a health care provider in the course of an established health care treatment relationship. All Web's calls neither remind patients who had a flu shot last year to come into the same pharmacy to receive this year's flu shot, nor confirm provision of medication to an individual in accordance with a prescription. … Instead, All Web's calls represent an effort to inaugurate a new relationship between an individual and a health insurance *issuer*.")

## II. The constitutional avoidance canon does not apply.

Foodsmart argues that the Court must employ a narrow interpretation of the term "telephone solicitation" due to the constitutional avoidance canon. However, as a threshold matter, that canon does not apply here. "Under the constitutional avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems. But a court relying on that canon still must *interpret* the statute, not rewrite it." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (emphasis in original). As such, the canon

only comes into play after the statute is found to be ambiguous. *United States v. Stivers*, 996 F.3d 800, 802 (7th Cir. 2021); *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d 1334, 1350-51 (S.D. Fla. 2022); *Robert W. Mauthe, M.D., P.C. v. Millennium Health LLC*, No. 18-1903, 2020 U.S. Dist. LEXIS 94513, at *39 n.11 (E.D. Pa. May 29, 2020) ("In the subsequent analysis, the court finds that the statute unambiguously defines the term 'advertisement.' Therefore, the court does not need to employ constitutional avoidance.") Here, as described above, the definition of "telephone solicitation" is not ambiguous, as the definition of "telephone solicitation" does not require the recipient of the call to pay out of pocket for the good or service being purchased.

Foodsmart's argument the constitutional avoidance canon applies is also flawed in that Foodsmart jumps to the unwarranted conclusion that its calls are "non-commercial" speech and bases its entire constitutional argument on that erroneous premise. Foodsmart cites the definition of "commercial speech" as "speech which does no more than propose a commercial transaction." *Virginia State Bd. Of Pharmacy v. Virginia Citizens Consumer*, 425 U.S. 748, 762 (1976) (quotation marks omitted). Then Foodsmart concludes, making the same arguments it did when arguing the calls aren't telemarketing, that the calls are "non-commercial." Foodsmart contends a constitutional issue results if the TCPA applies to Foodsmart's communications and thereby restricts non-commercial speech on the basis of content, but Plaintiff is not arguing that Foodsmart's communications are non-commercial speech. The whole discussion of constitutional avoidance is really a side show because it is difficult to imagine a scenario where a communication would be a telephone solicitation (*i.e.* for the purpose of encouraging the purchase of a service of a for-profit entity) but not be "commercial" speech, and Plaintiff does not contend such a scenario is present here. Foodsmart's calls are telemarketing and they are

commercial in nature. Foodsmart doesn't contend there are any constitutional issues with the TCPA if its speech is "commercial."[4]

It should also be noted that Foodsmart's brief discussion of what speech is and is not "commercial" blatantly ignores and fails to inform the Court of the relevant Seventh Circuit precedent on the issue. Foodsmart interprets the definition of "commercial speech" in *Virginia State Bd. Of Pharmacy* to mean that if a communication "does more" than propose a commercial transaction, then it becomes "non-commercial". (*See* Doc. 28-1, p. 15 ("[the communications] certainly did not "do[] no more than propose a commercial transaction.") But the Seventh Circuit has explained:

> It's important to recognize, however, that this definition is just a starting point. Speech that does *no more than* propose a commercial transaction "fall[s] within the core notion of commercial speech," *Bolger*, 463 U.S. at 66, but other communications also may "'constitute commercial speech notwithstanding the fact that they contain discussions of important public issues,'" *Fox*, 492 U.S. at 475 (quoting *Bolger*, 463 U.S. at 67-68).
>
> Indeed, the Supreme Court has "'made clear that advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech.'" *Zauderer*, 471 U.S. at 637 n.7 (quoting *Bolger*, 463 U.S. at 68) (internal quotation marks omitted). Although commercial-speech cases generally rely on the distinction between speech that proposes a commercial transaction and other varieties of speech, *id*. at 637, **it's a mistake to assume that the boundaries of the commercial-speech category are marked exclusively by [**18] this "core" definition.7** *See Bolger*, [*517] 463 U.S. at 66-68 (applying the commercial-speech classification to informational pamphlets discussing the benefits of prophylactics but also describing [***1794] the manufacturer's prophylactic products). **To the contrary, there is a "commonsense distinction" between commercial speech and other varieties of speech, and we are to give effect to that distinction**.

[4] Accordingly, Plaintiff does not believe the Court needs to engage with Foodsmart's argument that it would be unconstitutional to regulate non-commercial speech based on content. If the Court does so, then Plaintiff notes that Foodsmart should have filed a notice of constitutional question and served the Attorney General of the United States before drawing into question to the constitutionality of the TCPA. *See* Fed. R. Civ. P. 5.1.

*Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516-17 (7th Cir. 2014) (citations omitted). To make the "commonsense distinction" between commercial and non-commercial speech," the Seventh Circuit looks to three main guideposts, not all of which are necessary: "whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014) (citing *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66-67 (1983)). Here, as described above, the calls promoted Foodsmart's service of a telenutrition visit with a Foodsmart dietician and specifically mentioned that service, and Foodsmart had a clear and direct economic motivation for the speech because it was compensated directly by CCHP when the member had the appointment just as if the member had paid out of pocket. There is simply no constitutional issue here.

## III. The initial phase of discovery was limited to the issue of whether the calls to Plaintiff were telemarketing.

The only issue in the initial phase of discovery is whether the calls at issue constitute telemarketing under the TCPA. The parties agreed in their Rule 26(f) report as follows: "the Plaintiff has agreed to focus the initial discovery period will focus **exclusively on whether or not the calls at issue were telemarketing**." (Doc. 20, p. 3.) Plaintiff further explained that while Plaintiff "disagrees that in almost any situation bifurcated discovery is appropriate … given the circumstances specific to this matter [*i.e.* the discrete telemarketing issue], the Plaintiff has agreed to this limited discovery window, which would otherwise not be appropriate from Plaintiff's perspective." (*Id.*). Foodsmart likewise explained its position that the calls at issue were not telemarketing calls and then wrote: "This alone dooms Plaintiff's individual and class claims and warrants the phased discovery schedule, as agreed by the parties, and as explained

below." (Doc. 20, p. 2.) "The parties therefore agree[d]" that "[t]he first 90 days of discovery will be limited to expedited discovery on Plaintiff's individual claim" and that if the Court denied Foodsmart's subsequent dispositive motion, the parties would propose a schedule for the rest of the case. (Doc. 20, p. 4.) As such, the "expedited discovery on Plaintiff's individual claim" the parties agreed to and proposed to the Court always consisted exclusively of discovery on the issue of whether the calls were telemarketing. The parties then had a Telephonic Scheduling Conference with the Court on June 20, 2023, and the Court's Minutes of Conference note only: "Court to adopt parties' proposed schedule." (Doc. 21.) The Court then adopted the parties' language from the schedule portion of their Rule 26(f) report, ordering: "The parties shall complete expedited discovery on Plaintiff's individual claim (Phase 1 Discovery)" no later than September 1, 2023. (Doc. 22.)

At the end of Foodsmart's Motion for Summary Judgment, it violates the limited scope of the expedited discovery in Phase 1 by tacking on additional undeveloped arguments that it is not vicariously liable for certain calls placed by QCS and that it is entitled to an internal Do Not Call safe harbor. Plaintiff hereby briefly addresses these inappropriate arguments, but should the Court understand its scheduling order to go beyond the scope of the parties' agreement in their Rule 26(f) report, Plaintiff respectfully seeks to conduct discovery on both issues and/or to brief them more fully.

Foodsmart does not argue that QCS was never its agent. It argues that after a do not call request from Plaintiff on a call with QCS, it cannot be liable for further calls because it is QCS' fault for not putting Plaintiff on its do not call list and for QCS not to do so exceeded its authority. Accordingly, Foodsmart argues, Plaintiff's National Do Not Call Registry claim must be dismissed because it requires at least two calls in a twelve month period, and at best,

Foodsmart can only be responsible for one. (*See* 47 U.S.C. 227(c)(5).) The premise of this argument is false. Foodsmart claims that "Foodsmart cannot be vicariously liable for any of the calls QCS placed after Plaintiff claims that he told QCS to stop calling (*which was on QCS's first call to Plaintiff*)." (Doc. 28-1, p. 13 (emphasis added).) There is no evidence Plaintiff told QCS to stop calling on the first call to Plaintiff. For this proposition, Foodsmart cites generally to Plaintiff's deposition testimony on pages 73 and 74 of the transcript, but nowhere does Plaintiff say that he told QCS to stop calling on the first call to him, which QCS says was in December 2021. Rather, Plaintiff said generally that he recalled five live calls and that he told the live callers he was not interested and *in some cases, but not all,* requested to be removed from marketing lists or calling lists. More discovery is needed on the call log QCS produced as Exhibit 1 to Richard Hamilton's Declaration, which was never produced in discovery, as the log appears to be incomplete. Moreover, without doing discovery on the specific dates of each call during this expedited discovery period only focusing exclusively on the nature of the calls, Plaintiff specifically referred to live calls occurring around June of 2022, not December 2021. Indeed, the evidence of the disposition of the first call shows that Plaintiff merely said he was "not interested – other" as opposed to making a request to never be called again, so Foodsmart's agent's own records do not even support Foodsmart's argument for dismissal. And, Plaintiff later lodged a formal grievance over the calls with CCHP in November 2022, and CCHP's response states that it discussed the grievance with Foodsmart. (*See* Scharen Dep., Ex. 17.) So, there is an issue of fact regarding whether Foodsmart was notified of that grievance before its further calls to Plaintiff in January 2023.

Finally, Foodsmart and QCS argue they are entitled to a finding as a matter of law that they "established and implemented, with due care, reasonable practices and procedures to

effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(C)(5)(c). In support, Foodsmart and its agent QCS do no more than make identical conclusory self-serving statements tracking the minimum requirements to be allowed to make telemarketing calls to residential telephone subscribers set forth in the TCPA's internal Do Not Call regulations. 47 C.F.R. § 64.1200(d). This argument is only applicable to Plaintiff's internal Do Not Call list claim, not his National Do Not Call Registry claim. To meet its burden to prove this affirmative defense, Foodsmart must prove, amongst other things, that its procedure is to honor all do not call requests but the call to Plaintiff was a mistake. *See* 47 C.F.R. 64.1200(d)(3). Foodsmart claims without citing to any evidence that Plaintiff's situation was a "one off, manual error," but Plaintiff has not been allowed to do the discovery on other individuals besides himself that would contradict that assertion. Indeed, the only evidence in the record at this point is that Plaintiff repeatedly asked not to be called, but continued to receive calls from Foodsmart. The evidence shows that Foodsmart's procedures were totally amiss, making it impossible for Foodsmart to demonstrate that they were implemented "with due care" and "effectively prevent[ed] telephone solicitations" in violation of the TCPA, much less as a matter of law. And, again, to the extent Foodsmart claims CCHP was lying when it told Plaintiff in writing prior to this lawsuit that it discussed Plaintiff's grievance with Foodsmart, there is an issue of fact that the jury would need to resolve.

## CONCLUSION

For the foregoing reasons, Foodsmart's Motion for Summary Judgment should be DENIED.

Respectfully submitted,

**/s/ Jonathan P. Misny**
Brian K. Murphy
Jonathan P. Misny
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
E-mail: murphy@mmmb.com
misny@mmmb.com

Anthony Paronich
Paronich Law, P.C.
350 Lincoln St, Suite 2400
Hingham, MA 02043
Phone: 617.485.0018
Fax: 508.318.8100
E-mail: anthony@paronichlaw.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 29, 2023, I electronically filed the foregoing document in the United States District Court for the Eastern District of Wisconsin, with notice of same being electronically served by the CM/ECF system, to all attorneys of record.

Ryan D. Watstein
James M. Ruley
Watstein Terepka LLP
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
ryan@wtlaw.com
ruley@wtlaw.com

Maria DelPizzo Sanders
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
msanders@vonbriesen.com

**/s/ Jonathan P. Misny**
Jonathan P. Misny