**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| JAMES HULCE, et al., | |
| Plaintiff, | Case No. 2:23-cv-00159-LA |
| v. | |
| ZIPONGO, INC. d/b/a FOODSMART, | |
| Defendant. | |

## ZIPONGO, INC D/BA/ FOODSMART'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................ 1

II. ARGUMENT ..................................................................................................................... 3

    A. The text of the DNC Rules establishes, and Foodsmart's business practices confirm, that none of the calls at issue are telephone solicitations. ......................... 3

    B. Plaintiff's overbroad reading of the telephone solicitation rule runs afoul of the First Amendment, so the doctrine of constitutional avoidance also weighs in favor of adopting Foodsmart's regulatory interpretation. ................................................. 3

    C. Plaintiff had ample opportunity to conduct discovery on Foodsmart's vicarious liability and Plaintiff's internal DNC claim, and his failure to do so doesn't entitle him to additional discovery. .................................................................................... 11

    D. The undisputed evidence shows that to the extent Plaintiff was called in violation of the TCPA, Foodsmart isn't vicariously liable for those calls. ........................... 12

    E. Foodsmart is entitled to summary judgment because Plaintiff has presented no evidence that Foodsmart and QCS don't routinely comply with the TCPA's internal DNC regulations. ...................................................................................... 12

III. CONCLUSION ................................................................................................................ 145

## I. INTRODUCTION

Foodsmart's Motion for Summary Judgment established that it didn't violate the TCPA in either of the ways Plaintiff alleged in his Complaint. First, none of Foodsmart's communications to Plaintiff run afoul of the TCPA's DNC rules because they apply only to "telephone solicitations," defined as communications that encourage consumers to purchase goods or services for sale. Foodsmart's communications didn't encourage Plaintiff to purchase anything. They only offered Plaintiff free nutritional counseling services that were available to him through his healthcare plan, which was also free as part of his state-funded Medicaid insurance. And any interpretation that sweeps in such communications would violate the First Amendment, so the doctrine of constitutional avoidance further compels that the communications were not telephone solicitations. Finally, even if they were, Foodsmart couldn't be liable for them because the call vendor (QCS) didn't relay Plaintiff's alleged do-not-call request to Foodsmart, in violation of its contractual obligation to do so. Foodsmart cannot be liable for the actions of a vendor that acted both outside the scope of the authority given, and contrary to Foodsmart's instructions.

Second, Plaintiff's internal DNC claim fails because both Foodsmart and QCS have and honor internal DNC policies because they do not want to annoy people, even though they are not required to have them for the calls at issue, which aren't telephone solicitations. As such, the regulatory safe harbor precludes liability here on Plaintiff's internal DNC claim, even if a Plaintiff received calls from QCS after he told him to stop calling as a result of one-off human error.

Plaintiff's opposition confirms that Foodsmart's Motion should be granted for these reasons. For example, Plaintiff *concedes* that Foodsmart's communications didn't ask Plaintiff to buy anything, which ends both of Plaintiff's claims full stop. And while Plaintiff contends that the calls are telephone solicitations anyway because Plaintiff's healthcare plan pays for the

healthcare services, no court has adopted this overbroad interpretation of the regulation, which is inconsistent with its plain language. Instead, courts around the country have concluded a communication is telephone solicitations only if it asks the consumer himself to make a purchase, which by Plaintiff's own admission didn't happen here. Plaintiff also points to innocuous language used by Foodsmart's internal team designating calls as "marketing." But this internal business language has no bearing on whether the calls are "telephone solicitation calls" as defined by the application regulations. Plaintiff also points to Foodsmart businesses that are irrelevant to Plaintiff's individual claim. For example, he points to a subscription pricing model Foodsmart offers whereby individuals can independently sign up for Foodsmart's services. But this is a red herring, as the communications Plaintiff received were not about that service, and that service wasn't even available to Plaintiff. Finally, Plaintiff's argument that his interpretation of the telephone solicitation rule would pass constitutional muster fails because it is premised on the faulty assumption that the calls are commercial in nature, which is contrary to the facts of this case.

As to Plaintiff's remaining internal DNC claim, Plaintiff bizarrely contends that Foodsmart's arguments regarding vicarious liability and compliance with the internal DNC rules are outside the scope of individual discovery. But the Court's order regarding discovery clearly limited discovery to Plaintiff's "individual claims," and both vicarious liability for the communications at issue and compliance with the internal DNC rules go directly to Plaintiff's individual claims. In acknowledgment of the Court's order in this regard, both parties took discovery on these issues and others that go to Plaintiff's individual claims. And the undisputed evidence in this case shows that, to the extent Plaintiff requested not to be contacted, that request was never relayed to Foodsmart. Further, Plaintiff has pointed to no evidence that Foodsmart didn't comply with internal DNC rules despite inquiring extensively about the same at deposition. So Foodsmart

is entitled to summary judgment on both of those additional grounds and its motion should be granted.

## II. ARGUMENT

### A. The text of the DNC Rules establishes, and Foodsmart's business practices confirm, that none of the calls at issue are telephone solicitations.

Foodsmart's Motion established that its communications to Plaintiff didn't encourage him to purchase anything and instead only referenced and concerned free nutritional services for CCHP members, who also paid nothing for their state funded insurance. This critically important fact resolves this whole case because, as numerous courts have held, only commercial solicitation calls or texts offering "property, goods, or services" for "sale" to telephone numbers registered on an internal or national DNC list are prohibited by the applicable rules. *See*, *e.g.*, *Trujillo v. Free Energy Sav. Co., LLC*, 2020 WL 7768722, at *2-3 (C.D. Cal. Dec. 21, 2020) (in granting summary judgment to defendant, concluding that the communications at issue in that suit, which offered free services to low-income individuals, weren't solicitations because they did "not evince any intent to secure a purchase by [the individual]; instead, they invite[d] the recipient to schedule free services" paid for by the state); *see also* Motion at 11 (collecting cases).

Plaintiff *concedes* (at 6) that the communications didn't ask him to purchase anything, yet he still argues that they are telephone solicitations because his state-funded healthcare plan would ultimately pay Foodsmart for his nutritional appointments if he had signed up for them. But, as explained above, below, and in Foodsmart's Motion (at 9-11), this reading of the statute is wrong. That is particularly true as to this case, where the communications were sent at the direction and prior approval of CCHP and the state of Wisconsin—the entities who were paying for the services because they wanted consumers to use them—because they *reduce* overall healthcare costs, effectively saving the state and the taxpayers money. So not only was Plaintiff not being asked to

3

purchase anything himself, the communications couldn't possibly have been encouraging the purchase of anything, from anyone—since both CCHP and the state had *already agreed* to pay for the services, and all that remained was to inform the low-income population about them at CCHP's request. Adopting Plaintiff's atextual position would punish good actors seeking to provide free state benefits to low-income individuals at the request of those paying for them just because there was some "economic motivation" for them. That's not the law, and no court has said it is.

All the cases involving the definition of telephone solicitation cited by Plaintiff are inapposite, as they all involve clear efforts by a party to get *the consumer* to pay for products and services. These cases support **Foodsmart's** interpretation of the statute, not Plaintiff's. *See Mantha v. Quotewizard.com, LLC*, 2021 WL 6061919, at *2 (D. Mass. Dec. 13, 2021), R&R adopted, 2022 WL 325722 (D. Mass. Feb. 3, 2022) (summary judgment denied where defendant was seeking to provide insurance quotes via text to Plaintiff); *Whittaker v. Freeway Ins. Servs. Am., LLC*, 2023 WL 167040, at *4 (D. Ariz. Jan. 12, 2023) (denying motion to dismiss where Plaintiff plausibly alleged defendant attempted to sell insurance to Plaintiff); *Chinitz v. NRT W., Inc.*, 2019 WL 720996, at *1 (N.D. Cal. Feb. 20, 2019) (denying motion to dismiss where defendant attempted to contact plaintiff regarding sale of house); *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 819 (8th Cir. 2015) (concluding motion to dismiss was improper where defendant attempted to contact plaintiff about film it was promoting); *Carlton v. PDR Network, LLC*, 80 F.4th 466, 476-77 (4th Cir. 2023) (denying motion to dismiss where Plaintiff plausibly alleged faxes at issue were commercial in nature). And all but one of these cases was decided at the motion to dismiss stage, where all allegations are construed in Plaintiff's favor. But Foodsmart has moved for summary judgment.

Plaintiff's appeal to the FCC's prerecorded message rule similarly falls flat. He claims (at 12) that the rule was amended to apply not just to "unsolicited advertisements" but also to

4

"telephone solicitations" to address concerns about purported "free offers" consumer received from telemarketers. But that's inapposite here, because Foodsmart isn't offering "free goods and services that are *part of an overall marketing campaign* to **sell** property, goods, or services" to consumers as the FCC was concerned with; instead, it's offering services that are completely free to low-income individuals through their state sponsored health plans. In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd 14014, 225 (F.C.C. June 26, 2003). In contrast to the companies described by the FCC, Foodsmart simply isn't trying to sell these low-income consumers anything. Indeed, it cannot even take payment from them.

Plaintiff also points to innocuous language used by Foodsmart's internal team designating calls as "marketing." But this sleight of hand has no bearing on whether the calls fall within the definition of "telephone solicitation." Like any business, Foodsmart provides information about its products and services, a function that laypersons routinely refer to as "marketing." The key distinction here, however, is that the calls placed by Foodsmart to Plaintiff only were about health-improving services that were free to him. And while Plaintiff argues that call scripts that attempt to explain why someone should be interested in the free services are an example of "aggressive marketing," these scripts are just an effort by Foodsmart to ensure that the low-income populations it serves are adequately informed about its services—something Foodsmart has a mandate from the state of Wisconsin to do, since its free services improve medical outcomes and save taxpayer dollars. Deposition of Jared Scharen at 65-66 (attached hereto as Exhibit A). That makes this case just like *Trujillo*, as further explained below, where the Court concluded the Defendant couldn't have violated the TCPA because it only offered free services to low-income consumers under a mandate from the state in an attempt to save taxpayers money and didn't try to sell the message recipients anything.

5

Plaintiff also attempts to contort an email from a Foodsmart employee celebrating a successful enrollment period as an illustration of Foodsmart's campaigns being more than just "informational notices." But this celebratory email does no more than illustrate that Foodsmart's employees are deeply invested in its mission of providing quality nutritional healthcare services that change people's lives. *See id.* at 75 ("I'm excited because these are 400 people who I know need help . . . [and] we – the company exists to help as many people as possible with food insecurity").

Finally, Plaintiff points to business practices irrelevant to Plaintiff's individual claim[1] by pointing out that Foodsmart has a subscription pricing plan that some individual consumers can purchase. But this is irrelevant here as this plan was never offered to Plaintiff via any method of communication, nor would anyone eligible for the CCHP promotion be offered or qualify for it. ECF 28-4 at ¶ 6. Rather, the communications at issue in this case only involved information about free services offered to low income, food insecure individuals through their state funded health plan. Indeed, just like in *Trujillo*, discussed below, QCS *couldn't even accept payment* from anyone else who hypothetically might have been interested in the program. ECF 28-4 at ¶ 8.

Although Plaintiff claims (at 12) that Foodsmart cites to no case interpreting the definition of "telephone solicitation" to require the recipient of the call to pay out of pocket, that is wrong. *Trujillo* is directly on point and demonstrates why summary judgment should be granted here. In *Trujillo*, Defendant sent texts to notify low-income residential customers of its weatherization services that were free to them through a state funded program. 2020 WL 7768722 at *2. Just like Plaintiff here, Trujillo argued that the text messages were "telephone solicitations" because the free services ultimately encouraged his utility company to purchase the Defendant's services. *Id.* The

---

[1] Plaintiff claims (at 9) that Foodsmart doesn't scrub its campaigns. But this misstates the record, which reflects simply that Foodsmart didn't scrub CCHP campaigns geared at CCHP subscribers (like Plaintiff) receiving free services through their healthcare plans. Ex. A at 105-106.

6

court concluded that "neither the statutory nor the regulatory text uses words like 'indirectly purchase' or 'purchase for the benefit of another person'" and observed that a host of courts around the country have concluded that "the target of the caller's encouragement must be the recipient of the call for there to be an improper purpose." *Id.* at *2 (quoting *Spiegel*, 2017 WL 4535951 at * 4); *see also Schulz v. Infogroup, Inc.*, 2020 WL 4201636, at *3 (N.D. Tex. July 21, 2020) ("Nothing in the complaint suggests that Infogroup ultimately sought to sell or rent any services or product **to Schulz** or solicit an investment **from him**." (emphasis added)); *Freyja v. Dun & Bradstreet, Inc.*, 2015 WL 6163590, at *2 (C.D. Cal. Oct. 14, 2015) ("Plaintiff points to no evidence that she was subjected to marketing during the call ...."); *Murphy v. DCI Biologicals Orlando, LLC*, 2013 WL 6865772, at *10, (M.D. Fla. Dec. 31, 2013) ("Because neither of the messages in this case **encouraged Murphy** to purchase, rent, or invest in anything, they do not constitute 'telephone solicitations' under the TCPA." (emphasis added)). *Trujillo* went on to reject the theory that an "implicit economic motive" was enough "to give rise to a reasonable inference of a specific purpose to encourage the purchase, rental, or investment in property, goods, or services." *Id.* at 3. The court concluded there was no triable issue because the text messages invited the recipient to schedule free services, not make a purchase, and Defendant lacked the ability to even receive payment from consumers. This is *exactly* the case here, as QCS's communications here offered free, helpful health-improving services to low-income consumers and QCS lacked the ability to even take payment from them. This Court should follow this directly-on-point case and grant Foodsmart's Motion.

Despite Plaintiff's attempts to sow confusion, the statutory and regulatory framework is clear: callers face liability only when they call a consumer on the DNC list and attempt to sell *the consumer* a product or service, as a "telephone solicitation" that "encourages" a purchase is only prohibited if made "to" a consumer. 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(c)(2). That didn't

happen here. For the uncontroverted reason that none of Foodsmart's calls were "telephone solicitations" under the TCPA, Plaintiff's DNC claim fails as a matter of law.

> **B.** **Plaintiff's overbroad reading of the telephone solicitation rule runs afoul of the First Amendment, so the doctrine of constitutional avoidance also weighs in favor of adopting Foodsmart's regulatory interpretation.**

Foodsmart explained in its motion that the doctrine of constitutional avoidance counsels against Plaintiff's atextual reading of the DNC rules because, to the extent they sweep in the healthcare speech at issue in this case, they would violate the First Amendment. That's because these communications provided information about an *entirely free* program that helped recipients and the taxpayers who fund Medicaid by battling food insecurity, bettering treatment outcomes, and reducing cost in the healthcare system. ECF 28-2 at ¶¶ 8-10. A rule that prohibits such communications but allows debt collection and pro-Nazi communications doesn't pass muster.

Plaintiff argues the canon of constitutional avoidance doesn't apply because the definition of telephone solicitation unambiguously should be interpreted in the expansive manner he posits. But that argument fails, as every court to interpret the provision has held otherwise, as noted above.

Alternatively, Plaintiff contends (at 20) that the speech at issue is commercial under the three-part test for evaluating commercial speech set forth by the Seventh Circuit. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014). *Jewel* involved a trademark and right-of-publicity dispute between basketball legend Michael Jordan and Jewel Food Stores because Jewel obtained advertising space in a magazine issue of *Sports Illustrated* that celebrated Jordan's career. *Id.* Jordan alleged Jewel misappropriated his identity by making it appear that he was endorsing their stores by the placement of their advertisement in the magazine. *Id.* Jewel claimed its advertisement was non-commercial speech (and thus subject to heightened scrutiny). To evaluate whether the advertisement was commercial speech, the Court asked "whether: (1) the speech

8
Case 2:23-cv-00159-LA   Filed 01/19/24   Page 10 of 19   Document 36

is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech," and concluded that in the instant case it definitively did because Jewel's "logo and marketing slogan, [we]re creatively and conspicuously linked to Jordan" in the advertisement and encouraged magazine readers to purchase Jewel's products. *Id.* at 511-512.

Although Plaintiff contends that Foodsmart "blatantly ignores" *Jewel*, its analysis just confirms that Foodsmart's communications at issue aren't commercial because, as explained above and in Foodsmart's motion (at 11-12, 15), they don't seek to encourage individuals to purchase *anything* from Foodsmart. Instead, they merely inform low-income consumers about free nutritional healthcare resources that increase positive outcomes and save the healthcare system and taxpayers money. The fact that Foodsmart is compensated for its services *by Plaintiff's state-funded healthcare provider* doesn't transform the informational communication into commercial speech. This alone distinguishes Foodsmart's communications from those in *Jewel*, which clearly sought to encourage consumers to shop at Jewel Stores based on their association with Michael Jordan. Moreover, the communications at issue here plainly fail the first and most important prong of the *Jewel* test as a communication offering a completely free service *isn't an advertisement*. *See BPP v. CaremarkPCS Health, LLC*, 2021 WL 5195785, at *2 (E.D. Mo. Nov. 9, 2021), *aff'd*, 53 F.4th 1109 (8th Cir. 2022) (affirming summary judgment because informational communications aren't advertisements); *Mauthe v. Optum*, 2018 WL 3609012, at *6 (E.D. Pa. July 27, 2018), *aff'd,* 925 F.3d 129 (3d Cir. 2019) (concluding a communication isn't an advertisement merely because it "declar[es] the availability of a good or service").

For these reasons and all those set forth in Foodsmart's Motion (at 14-15), the provision that issue would be subject to strict scrutiny, which Plaintiff concedes it couldn't survive. But even if Plaintiff was right, and the speech at issue is commercial, the provision would fail

9

intermediate scrutiny because it is: (1) unsupported by a "substantial" government interest; (2) fails to "directly and materially advance[]" that interest; and (3) is not "no more extensive than necessary" to serve the government's interest. *Ibanez v. Fla. Dep't of Bus. & Prof. Reg.*, 512 U.S. 136, 142-43 (1994) (citation omitted). First, preventing a limited subset of at-risk Americans from being annoyed by calls about free healthcare services is not a substantial interest. *Cf. Craig v. Boren*, 429 U.S. 190, 199 (1976) ("[T]he protection of public health and safety" is a substantial interest). Second, even if the government had a substantial interest in avoiding annoying calls more generally, the telephone solicitation rule does not "materially advance" that interest since it bans only communications that promote goods or services for sale, excepting all other forms of unsolicited communications. *See Barr v. Am. Assoc. of Pol. Cons., Inc.*, 140 S. Ct. 2335, 2357 (2020) (explaining that the TCPA's content based robocall restriction failed intermediate scrutiny because it permitted "many of the intrusive calls" that the "ban was enacted to prohibit") (Sotomayor, J., concurring). Indeed, even worse than in *Barr*, where the provision at issue was stricken down, the DNC rules do not apply to *all types of calls* that people find far more annoying than those about free services available to them under their health plan. That includes debt collection calls, political solicitations, charitable donation calls for organizations that recipients may vehemently disagree with, and so on. Third, and relatedly, Plaintiff could never show that the DNC rules, as he interprets them, are "no more extensive than necessary," since Plaintiff's interpretation sweeps in speech about free healthcare services, which goes far beyond Congress's purported justifications for the DNC rules. *Ibanez v. Fla. Dep't of Bus. & Prof. Reg.*, 512 U.S. 136, 142-43 (1994) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)).

The Court should avoid those constitutional problems by adopting the "narrow[er] reading" of the TCPA's definition of telephone solicitations that does not sweep in the communications at issue.[2] *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002).

### C. Plaintiff had ample opportunity to conduct discovery on Foodsmart's vicarious liability and Plaintiff's internal DNC claim, and his failure to do so doesn't entitle him to additional discovery.

Foodsmart explained in its motion (and further below) that even if Plaintiff did request not to be contacted about its services it's not vicariously liable for the calls because QCS acted outside of its authority by not transmitting the opt-out request to Foodsmart and by continuing to contact him. Nor is Plaintiff's internal DNC claim viable because both Foodsmart and QCS implemented and adhered to the procedures necessary to create a safe harbor from Plaintiff's claims.

Plaintiff's primary counter to these arguments is that the scheduling order precludes Foodsmart from making these arguments, since Plaintiff was prohibited from taking discovery on those issues. That is wrong. The original Court order defined Phase I Discovery as "discovery on plaintiff's individual claim" and set deadlines both for completing Phase I discovery and filing dispositive motions related to the same. ECF 22. Although Plaintiff observes (at 21-22) that the parties' joint status report (ECF 20) proposed limiting discovery to whether the calls were telephone solicitation, this is irrelevant given that the Court's scheduling order set a discovery deadline for "plaintiff's individual claims." ECF 22. Plaintiff's own discovery served on Foodsmart confirm he understood this, given that he asked for the identify of "the Third Parties or Vendors

---

[2] Plaintiff contends (at 20 FN 4) that the Court does not "need[] to engage with Foodsmart's argument that it would be unconstitutional to regulate non-commercial speech based on content. Foodsmart's Motion speaks for itself on this point, but to the extent Plaintiff contends Foodsmart failed to provide Fed. R. Civ. P. 5.1 notice to the Attorney General, Foodsmart expressly reserved this issue in its briefing (at 15 FN 2) subject to the Court's direction.

involved with the campaign(s) that resulted in phone calls and text messages to Plaintiff" and sought documents as broad as "all of Your policies regarding telephonic communications", "[a]ll business plans, marketing plans, memoranda, presentations, minutes, or other documents referencing Your strategy for telephonic communications to current or potential users for Your services." Plaintiff's First Set of Discovery Requests to Foodsmart at 9-11 (attached hereto as Exhibit B). Plaintiff's counsel questioned Foodsmart's corporate representative extensively about Foodsmart's relationship with QCS (Ex. A at 17-18, 37-38, 99-101; attached hereto as Exhibit A) and Foodsmart's compliance with internal DNC list requirements. *Id.* at 81-86.

At bottom, whether Foodsmart is vicariously liable for the calls placed to Plaintiff and whether Foodsmart and QCS complied with their internal DNC policies are both dispositive of Plaintiff's "individual claims," which is within the scope of discovery the Court adopted. If Plaintiff wanted additional discovery on these issues, he could have sought it, but his failure to do so doesn't now entitle him to hold these claims open pending additional discovery. And, as set forth below, the undisputed facts show that Foodsmart is entitled to summary judgment on both issues.

### D. The undisputed evidence shows that to the extent Plaintiff was called in violation of the TCPA, Foodsmart isn't vicariously liable for those calls.

Even assuming the telephone calls at issue are telephone solicitations (they aren't), Foodsmart cannot be directly or vicariously liable for them. It's undisputed that QCS, not Foodsmart, placed the phone calls at issue in this case, so Foodsmart can't be directly liable for them. Nor can Foodsmart be vicariously liable because, assuming Plaintiff is correct that he requested not to be contacted when he spoke to a QCS representative, QCS acted contrary to Foodsmart's instructions when it did not subsequently place him on its internal DNC list and transmit that request to Foodsmart, which would have ended any future communications to Plaintiff.

Plaintiff's attempts to manufacture factual disputes about Foodsmart's liability are unavailing. First, Plaintiff claims (at 23) that there is a fact dispute about when he requested not to be contacted by QCS about Foodsmart's products and services. But the QCS call records definitively establish that Plaintiff only spoke to live callers twice, in late 2021 and early 2022, and indicate that Plaintiff stated he wasn't interested in Foodsmart's services at that time.[3] *Id.* Nor can Plaintiff dispute those call records because (a) they line up perfectly with the Foodsmart voicemails he produced in discovery, and (b) his testimony contradict them because he admitted he doesn't remember every phone call he received. *Compare* ECF 28-3 at 19-20 *with* ECF 28-4 at 7. Thus, assuming for the purposes of this motion that Plaintiff's testimony is true that he did request not to be contacted by QCS, the only time he could have done so was on those early calls. The undisputed evidence shows that QCS never conveyed that opt-out request to Foodsmart, meaning it can't be vicariously liable for any subsequent calls—which were made against Foodsmart's specific direction. *See, e.g.*, *Cordoba v. DIRECTV, LLC*, No. 1:15-CV-3755-MHC, 2021 WL 6841777, at *5 (N.D. Ga. Feb. 12, 2021) (granting summary judgment to defendant in TCPA case and finding no actual authority because vendor was not permitted to make calls at issue); *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 825 F.3d 793, 798 (7th Cir. 2016) (no actual authority in TCPA case where communications at issue prohibited by alleged principal).

Plaintiff similarly attempts to sow confusion and manufacture a fact issue by claiming that Foodsmart was advised by CCHP of his November 2022 letter requesting not to be contacted. In support, Plaintiff cites to an unauthenticated letter from a non-party that they chose not to depose. But this "letter" has never been authenticated, so it's inadmissible under binding authority. *Beales*

---

[3] Plaintiff contends (at 23) that more discovery is needed on the QCS call log because it "was never produced in discovery." But this is a red herring because the call log doesn't belong to Foodsmart, it belongs to QCS, and Plaintiff never sought any discovery from QCS.

13

*v. Plymouth*, 2010 WL 11601251, at *6 (E.D. Wis. Jan. 21, 2010), *aff'd sub nom. Beales v. City of Plymouth, Wis.*, 392 F. App'x 497 (7th Cir. 2010) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence") (internal citation omitted)); *Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003) (stating that evidence relied upon to defeat a motion for summary judgment must be evidence of a type admissible at trial) (internal citation omitted). So the undisputed, admissible evidence in this case is that even if CCHP sent this letter, Foodsmart never received it. Accordingly, it can't be held liable for calls placed on its behalf that didn't comply with an opt-out request it never received. Ex. A at 107.

The bottom line is that Plaintiff could have added QCS to this lawsuit, as QCS could be directly liable as the caller. But Plaintiff chose to proceed against Foodsmart only, and so is required to establish that Foodsmart can be vicariously liable for the calls QCS made. Plaintiff cannot meet his burden, so Foodsmart is entitled to summary judgment on this ground alone.

    **E.**    **Foodsmart is entitled to summary judgment because Plaintiff has presented no evidence that Foodsmart and QCS don't routinely comply with the TCPA's internal DNC regulations.**

Foodsmart established in its motion that both it and QCS complied with the internal DNC regulations to a T, implementing all five required procedures. *See* ECF 28-2 at ¶¶ 27-31; ECF 28-4 at ¶¶ 11-15. Foodsmart and QCS's implementation of these procedures is dispositive of Plaintiff's internal DNC claim, as any call to Plaintiff after a legitimate DNC request was exactly the sort of one-off, manual error that the safe harbor was designed to protect businesses with proper procedures against. *See Simmons v. Charter Communications, Inc.*, 222 F. Supp. 3d 121, 140 (D. Conn. 2016), aff'd 686 Fed. Appx. 48 (2d Cir. 2016) (in affirming summary judgment for defendant, noting that "[t]he mere fact that [plaintiff] received a call after his [] request is not a subsection

(d)(3) violation" and "as long as Defendant had a proper procedure in place to implement its DNC policy, no reasonable jury could find for [plaintiff]").

Instead of raising any challenge to this dispositive claim, Plaintiff argues that he needs additional discovery to establish if it was a one-off error. But Plaintiff has had ample opportunity to conduct discovery related to his individual claims and indeed both sought documents regarding Foodsmart's relevant policies and asked its corporate representative about the same at deposition. Ex. B at 10; Ex. A at 81-86. Despite this discovery, Plaintiff can point to nothing showing either Foodsmart or QCS's didn't comply with its internal DNC rules. Accordingly, Foodsmart is entitled to summary judgment on this ground as well.

## III. CONCLUSION

Plaintiff concedes that Foodsmart never tried to get him to purchase anything, instead only ever offering him services that were free to him through his state-funded insurance plan. Despite this, Plaintiff attempts to push a novel interpretation of the DNC rules to impose liability on Foodsmart because they received compensation through Plaintiff's healthcare plan if he signed up for telenutrition visits. This interpretation defies the text, commonsense, every on-point decision, and would disincentivize informational healthcare communications. In addition, it would unleash a host of constitutional issues that this Court need not delve into. But even if the DNC rules do apply, Foodsmart cannot be vicariously liable for the calls at issue given QCS's failure to transmit do not call requests to it and both Foodsmart. And even if that were not true, Plaintiff's internal DNC claim fails because Foodsmart and QCS implemented policies and procedures establishing that any failure to honor an internal DNC request was a one-off occurrence.

For the reasons stated herein, this Court should grant Foodsmart's Motion.

Dated: January 19, 2024

15
Case 2:23-cv-00159-LA   Filed 01/19/24   Page 17 of 19   Document 36

Respectfully submitted,

*/s/ Ryan D. Watstein*
Ryan D. Watstein
James M. Ruley
WATSTEIN TEREPKA LLP
1055 Howell Mill Rd. 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-0695
E-mail: ryan@wtlaw.com
E-mail: jruley@wtlaw.com

Maria DelPizzo Sanders
State Bar No. 1031037
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
Telephone: 414.221.6652
E-mail: maria.sanders@vonbriesen.com

*Attorneys for Defendant Zipongo, Inc. d/b/a Foodsmart*

# CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, I caused to be electronically filed the foregoing document in the United States District Court for the Eastern District of Wisconsin, with notice of same being electronically served by the CM/ECF system, to all attorneys of record.

*/s/ James M. Ruley*
James M. Ruley
